## THOMPSON v. A. J. TEBBE & SONS CO.
### No. 4797.

Court of Civil Appeals of Texas. El Paso.
June 13, 1951.

See also, 241 S.W.2d 633.

Kleberg, Mobley, Lockett & Weil, Edmond J. Ford, Jr., Corpus Christi, for appellant.

Butler & Williams, James Williams, Robstown, for appellee.

McGILL, Justice.

This is an appeal from a judgment of the District Court of Nueces County, 28th Judicial District.

In a trial to the court without a jury appellee as plaintiff recovered a judgment against appellant as defendant for $862.79 with interest from date at 6% per annum as damages to two carloads of onions shipped by plaintiff from Cotulla, Texas, to St. Louis, Mo., and diverted to Chicago, Ill., and there sold for plaintiff by La Mantia Bros. Arrigo Company, wholesale dealers and jobbers of fruits and vegetables.

The petition is in two counts. Count I relates to a shipment in car M.D.T. 6301 on May 17, 1946, and Count II to a shipment in car number A.R.T. 17861 made on May 21, 1946. It was alleged that the onions shipped in car 6301 were delivered to defendant on May 17, 1946 in a good and marketable condition and arrived in Chicago for the market of May 28, 1946 in a bruised and decayed condition showing evidence of rough handling upon arrival; that had the onions been properly carried and promptly delivered they would have

been of the fair cash market value of $1,716.50, but due to the delay and rough handling by defendant they were of the market value of only $1,147.25, to plaintiff's damage $569.25; that the onions shipped in car 17861 were delivered to defendant on May 21, 1946 in a good and marketable condition and arrived in Chicago for the market of May 28, 1946, and upon arrival were in a decayed and bruised condition showing evidence of rough handling; that had the onions been properly carried and promptly delivered they would have been of the fair cash market value of $1,785.00 but due to the delay and rough handling they were of the market value of only $1,337.50, to plaintiff's damage $447.-50. Defendants answered by a general denial.

The court filed elaborate findings of fact and conclusions of law—twelve original fact findings on Count I and the same number on Count II, and three conclusions on each of Counts I and II. At the request of defendant he also granted seven additional fact findings on Count I and eight additional fact findings on Count II, and two additional conclusions on each count.

Appellant has presented 29 points on which he relies for a reversal of the judgment relating to Count I, and 18 points relating to Count II. We shall not attempt to state these points in detail. In general they attack the court's findings because there is no evidence, or insufficient evidence, to support them, and complain of the court's failure to make requested findings asserted to be shown by uncontroverted evidence. We shall only refer to the findings deemed essential to a proper disposition of this appeal.

All appellant's points are summarized under four groups: (1) There is no evidence and insufficient evidence that the condition of the onions at origin when loaded was good or sound; (2) no showing of the fair market value of the onions at destination had they been transported with reasonable care, diligence and dispatch; (3) no showing of the fair market value of the onions on the date they actually arrived in the condition they actual-

ly arrived; and (4) no evidence of negligence on the part of the carriers causing the damage found on arrival. We shall first discuss (3) above.

The court found (11) that the actual fair cash market value of the onions in car M.D.T. 6301 in their decayed condition upon arrival in Chicago was $1,147.25. He also found (10) that had this car been properly transported these onions would have been of the reasonable fair cash market value of $1,716.50 upon arrival. He found that the actual fair cash market value of the onions in car A.R.T. 17861 in their decayed condition upon arrival in Chicago was $1,337.50; (11) also that had this car been properly transported and delivered these onions would have been of the reasonable fair cash market value of $1,453.00 upon arrival. He concluded that plaintiff was damaged as to the onions shipped in car M.D.T. 6301 in the sum of $569.25, and as to those shipped in car A.R.T. 17861 in the sum of $115.50. An additional conclusion is that the damages are measured by the difference in value of the onions at the time they should have arrived if transported with reasonable care, diligence and dispatch, and their value in the condition and on the dates on which they actually arrived.

■ The additional conclusion unquestionably states a correct abstract proposition of law, under the Interstate Commerce Act governing interstate shipments such as these: Sec. 20(11), 49 U.S.C.A., which provides that the carrier shall be liable to the holder of the bill of lading "for any loss, damage, or injury to such property", and "for the full actual loss, damage, or injury to such property". Texas & N. O. R. Co., v. Searcy, Tex.Civ.App., 220 S.W.2d 366 (w. r. n. r. e.). It is at once apparent from the findings that the value which the court applied is the market value. Unless the findings as to market value are supported by the evidence the judgment is not supported by the findings since there are no findings as to any value other than market value.

Plaintiff introduced two inspection reports of the condition of the onions in car M.D.T. 6301 at its destination in Chicago. One is dated May 27, 1946, at 3:35 P.M., and was made by La Mantia Bros., Arrigo Company, which handled the onions for plaintiff. In this report the condition of the load and the grade and quality of the onions is thus described:

"Condition
of Load.    3 to 12" shift A to B end. No visible breakage ·

Barbaros    Fairly good quality, weak condition good pack irregular size

Quality    2 to 3½ in right doorway region bags at ends of car 2½ to 4½. Onions are clean, fairly well and wellformed, 5 to 10% ill shapes, firm fairly firm, crisp, with 40 to 30 weak open necks, none to 6 average 3%

Pack    fresh green sprouts 1 to 2" long skins are fairly well set to some loose and feathery. Fairly good to * * * good

Sizing    color, 2 to 6% mechanical injury, 2 to 10 average 6% decay. Fairly good appearance.

Remarks    Bermuda Onions Large size 3 to 4½ showing 40 to 50% decay.
    (Stamped) 4717
White Onions, Fairly good quality, weak condition, good pack, Irregular size 1 to 2½. Onions are clean, fairly well and wellformed, 5 to 10% ill shapes firm fairly firm, crisp skins are fairly wellset to few loose and feathery, good color packs are damp and wet, 4 to 40% average 20% decay. Fairly good and poor appearance."

The other report, or certificate, is dated May 28, 1946, at 11:55 A.M. and was made by an inspector of the U. S. Department of Agriculture. In this certificate the onions inspected and their condition is thus described:

"Products inspected and distinguishing marks: Crystal wax Yellow Bermuda and Yellow Babosa type Onions in separate

paper-net sacks branded 'Texas Onions Diamond T brand, A. J. Tebbe & Sons Co., Cotulla, Texas'. Crystal Wax type in 25-lb sacks, others in 50-lb sacks. Manifested as 510 sacks.

"Condition of load and containers: Through lengthwise and crosswise load, 5 to 8 layers, 2 to 8 rows. Many 25-lb sacks moldy and show small to large wet spots.

"Temperature of product: Not taken.
"(Stamped) 4717

"'Crystal Wax' lot from 3 to 45%, average approximately 20% decay, Bacterial Soft Rot and Black Mold Rot. 'Yellow Bermuda' lot from 35 to 60%, average approximately 50% .

"Condition: decay. Bacterial Soft Rot and Black Mold Rot. 'Yellow Babosa' lot in most sacks 3 to 13% decay, in some none, average approximately 5% Bacterial Soft Rot. Decay in all lots in various stages, mostly advanced, remainder of stock generally firm, mostly dry and well cured, some damp and fairly well cured.

"Remarks: Inspection and certificate restricted to product in upper 3 layers, and to condition only at applicant's request".

Plaintiff also introduced similar reports showing the condition of the onions in car A.R.T. 17861 at destination. La Mantia Bros. report on this car is dated May 28, 1946, at 7:15 A.M. and the condition and the quality of the onions therein described:

"Condition
of Load    Okay
"Quality    Fairly good and fair weak
           condition
"Pack       Good
"Sizing     Irregular size, 2½ to 4 many
           bags 3 to 4½
"Remarks    Onions are clean, fairly clean,
           fairly well and well formed,
           occasional ill shape, firm crisp,
           with 25 to 35% weak open
           necks, skins are fairly well set
           to many loose and feathery,
           fairly good and good color, 1
           to 4% mechanical injury,
           some with 8 to 26 average 15%
           decay early to fairly well ad-
           vanced state, Fairly good and
           fair appearance."

The U. S. Department of Agriculture certificate on this car is dated May 28, 1946 at 9:45 A.M. and the condition of the onions stated:

"Condition: From 7 to 35%, average approximately 15% decay, generally Bacterial Soft Rot in all stages, mostly advanced. Remainder of stock firm and well cured.

"Remarks: Inspection and certificate restricted to product in three upper layers and to condition only at applicant's request."

Plaintiff introduced a portion of the U. S. Dept. of Agriculture market report which showed the Chicago onion market on May 27 for Yellow Bermudas was $3.00, 3″ and larger $3 to $3.25, White Wax $2.60 and Texas Mediums $2.25, 50-lb. sacks Yellow Bermudas at $3, also a similar market report for May 28, 1946 as follows: "Chicago Onion Market: Supl. mod. Dem. good, mkt. sl. stronger. Carlot Trk Sales: No early sales reported. Late sales Monday: Texas 50-lb sacks Yellow Bermudas, fair to gen'l good qual. & cond., med. size, 3–2.75, 1–2.65, 2–2.50.—Texas 50 lb. sacks White Wax, gen'l good qual., med. size 2.85. Truck Receipts: Tex. 50 lb. sacks Yellow Bermudas, good qual. med. size 2.90–3.00. Street Sales by Jobbers. Texas 50 lb. sacks Yellow Bermudas, fair to gen'l good qual. and cond. 2.75–3.00, few best 3.25, 3″ and larger 3.00–3.25. White Wax gen'l good qual. & cond., 2–3″ 3.00, ord. cond., med. size 2.25." And for May 29, 1946: "Chicago Onion Market: Supl. mod. Dem. fair mkt. stdy, for best stock. Carlot Trk Sales: Early sales Wednesday: Texas 50 lb. sacks, 1 car mixed Grano Yellows, gen'l good qual. med. size 2.75, Bermudas, Pinks, gen'l good qual. med. size 2.25. Late sales Tuesday: Texas 50 lb. sacks Yellow Bermudas, 1 car gen'l good qual. med. size 2.65. L.C.L. Trk Sales to Jobbers: 50 lb. sacks White Wax, gen'l good qual., med. size 2.85, Truck Receipts: Texas 50 lb. sacks Yellow Bermudas, good qual. med. size 2.90. Street Sales by Jobbers: Texas 50 lb. sacks Yellow Bermudas, gen'l good qual. med. size 3.00–3.25, ord. to fair qual. and cond. 2.25–2.75, poorer 1.75–2.00; 3″ and larger, gen'l good qual. 3.25–3.35, fair cond. 3.00. Yellow Babosas, gen'l good qual. med. size, few sales 3.00. White

Wax, good qual. med. size 3.25, fair cond. 2.75–3.00, poorer 2.50, 50 lb. sacks White Boilers, few sales 1.75."

He also introduced a sales account of La Mantia Bros. Arrigo Company dated June 7, 1946, showing the following:

"Sold for account of     A. J. Tebbe & Sons Company     June 7th, 1946

Cotulla, Texas.     Chicago 8, Ill.
"102033

Folio 39207     Car No. MDT 6301     Received 6/4/46

441 Sx Med Yellow Bermuda & Babosa Onions Average 2 36–1042.25
    200 at 2.50, 241 at 2.25

1 short

140 25# sx Wax Onions at .75                  105.00

                                            1147.25

(Stamped) 4717

Government Inspection Certificate Attached.

|  | | |
|---|---|---|
| Trans. Tax | .79 | |
| Govt Ins. | 5.00 | |
| St Louis Dem | 4.53 | |
| Dem HT | 10.20 | |
| Dem | 4.53 | |
| Charges { unloading | 10.00 | |
| Freight | 242.68 | |
| Cartage | 26.25 | |
| Commission | 80.31 | 384.29 |
| Net Proceeds Cr. A/C | | 762.96" |

A similar sales account dated June 6, 1946, as follows:

"Sold for account of     A. J. Tebbe & Sons     Chicago 8, Ill.

Cotulla, Texas     102040

Folio 39046     Car No. ART 17861     Received 5/31/46

420    Sx Lgc Babosa Onions Average 2 69            1130.75

      12 at 3 25      194 at 3.00     109 at 2 75
      105 at 2 00

1    Empty

6    Short

83    Sx Yellow Boilers Average 2 49               206.75

      3 at 2 75     74 at 2 50     6 at 2 25

               (Stamped) 4719

                                      1337.50

Government Inspection Certificate Attached

|  | | |
|---|---|---|
| Trans Tax | 75 | |
| Govt Insp | 5 00 | |
| Ice | | |
| Dem | 10.20 | |
| Charges { Unloading | 9.95 | |
| Freight | 241.40 | |
| Cartage | 25.15 | |
| Commission | 93 63 | 368.08 |
| Net Proceeds Cr. A/C | | 951.42" |

■ It is at once apparent from a careful reading and analysis of the above that there are no quotations from the market reports for onions of the grade and quality and in the condition described by the inspection reports. Therefore, the sole basis for the court's findings of the market value of the onions in the condition and at the time of their arrival is the amount received for them as reflected by the accounts of the sales. The inference is inescapable that the court accepted these amounts in arriving at his findings from the fact that the value reflected by the findings is the exact amount in the statements of accounts of sales. That this is not competent evidence on which to base market value under such circumstances has been definitely held by the Supreme Court. Rio Grande & E. P. R. Co. v. T. A. Austin & Co., Tex.Com.App., 25 S.W.2d 306, (Com.App. holdings approved). Appellee relies heavily on the case of Thompson v. Tankersley, recently decided by the San Antonio Court of Civil Appeals, 238 S.W.2d 263. He quotes from the opinion in that case as follows:

"In most instances, where personal property valuations are involved, evidence of what an article or commodity actually sold for is some evidence of market value, 17 Tex.Jur. 443, Evidence, Sec. 165. However, in cases of commodities which are quoted and sold on established markets day after day, *the party claiming damages may proceed upon the theory that out of grade commodities have no market value, as there are no quotations made with reference to them.* Each out of grade shipment differs from another and cannot be classified for sales purposes.

"The measure of damages in cases of this kind is the difference in market value of the commodity had it arrived at market in an undamaged condition and the market value of the commodity in its damaged condition. Where there is no market value of the commodity in its damaged condition, the plaintiff is entitled to recover the market value of the commodity in an undamaged condition, less such sum as the commodity might be sold for in a good faith effort to minimize damages". ·

The opinion in that case on motions for rehearing was filed January 10, 1951. The above quotation does not appear in this opinion, but it does appear therefrom that the opinion is substituted in lieu of the original opinion. We assume that the quotation does appear in the original opinion. From the opinion on rehearing it appears that the jury found in answer to special issue No. 4 that the market value of the tomatoes involved, on arrival in Baltimore in their damaged condition was $83.25, which was the gross amount realized through salvage operations by the delivering carrier, after acceptance was refused and the car was abandoned to the carrier by the consignee. The court expressed the view that it was not material whether this finding was supported by the evidence since it conclusively appeared that the tomatoes were out of grade upon arrival at destination and could not be sold on the Baltimore market for as much as $383.23, the amount of freight charges, and stated that "The measure of recovery was the reasonable cash market value of the car of tomatoes at the time of their arrival in Baltimore without material damage, less the freight charges" and affirmed the trial court's judgment for this amount. The distinction between the decision in the Tankersley case and the rule quoted in the original opinion which was enunciated by the San Antonio Court of Civil Appeals in Texas Mexican Railway Co. v. Slaughter, 122 S.W.2d 1101, loc. cit. 1103(3) and followed by this court in Texas & N. O. R. Co. v. Searcy, supra, loc. cit. 220 S.W.2d 366–368 is that in the Tankersley case the damaged tomatoes were refused by the consignee and disposed of by the carrier and of course the carrier could not complain that the damages were not sufficiently minimized because of its own failure to get an adequate price for the damaged property which it sold, while in the Slaughter and Searcy cases the damaged tomatoes and the damaged fruit and vegetables were sold by the shipper or his consignee and the court found that the salvage value as shown by the account of sales was the best price obtainable for the products in the condition and at the time of arrival. There is no such finding in this case.

The judgment is based on findings of market value which, as we have shown, are not supported by any evidence except the accounts of sales, which the Supreme Court has held is incompetent to show market value. Therefore, the judgment must be reversed and the cause remanded, and it is so ordered.

This disposition renders discussion of the other points unnecessary. We have carefully considered them, and overrule them.

Reversed and remanded.