**SUNSET MOTOR LINES, Inc., Appellant,**

v.

**LU–TEX PACKING COMPANY, Inc.,**
**Appellee.**

**No. 17131.**

United States Court of Appeals
Fifth Circuit.

June 13, 1958.

William I. Marschall, Jr., San Angelo, Tex., Ralph W. Currie, Dallas, Tex., Hardeman, Smith & Foy, Runge, Marschall & Runge, San Angelo, Tex., Currie, Kohen & Freeman, Dallas, Tex., of counsel, for appellant.

James P. Hart, Jack, Sparks, Austin, Tex., Tom G. Oliver, Jr., San Marcos, Tex., Hart, Brown, Sparks & Erwin, Austin, Tex., of counsel, for appellee.

Before RIVES, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

In this appeal by the initial truck carrier held liable after a non-jury trial for the total loss of a shipment of fresh beef, three questions are presented: (1) was there adequate evidence of the market value of the goods as shipped in good condition and as delivered in bad condition; (2) was it error or prejudicially harmful for the Court to have excluded an original Department of Agriculture form specifying the amount of meat condemned as unfit; and (3) on liability, did the evidence overcome the presumption of carrier's negligence? Only the first has much substance.

■ Question (1) has two facets: the nature, kind, quality and value (at destination) of the goods as actually shipped had they arrived in good condition; and the market value, if any, of the goods in their damaged condition on delivery. As proof of this is normally a burden of the shipper, the Carrier [1] urges that if the evidence were insufficient on either phase, judgment cannot stand. On the first facet, the contention, more specifically, is that all the Shipper did was prove the destination market value of the nature, kind, value and condition as *ordered,* and not, as the rule requires, that actually *shipped.* On the second facet, the contention, more specifically, is that all the Shipper proved was the price received on the salvage disposition of the damaged goods and not, as required, the market value of bad meat in Chicago. There is some literalism to support this view regarding both the shipment condition [2] and value [3] in bad order at destina-

---

1. The initial Carrier who issued a through straight ICC bill of lading was Sunset Motor Lines, Inc. The specified delivering Carrier was Strickland Transportation Company, Inc., with whom the Shipper had made the original oral freight engagement. Sunset brought the two reefer cargo trailers to the Shipper's packing plant at Luling, Texas, and after they were loaded by Shipper, hauled the trailers to San Antonio. There they were turned over to Strickland who transported the goods in the same trailers from San Antonio to Chicago where delivery of one was declined by the con-

signee. Sunset is the defendant-appellant, but in view of some uncontradicted testimony showing that Sunset considered this a clear case of fault against Strickland, the defense has the earmarks of one made by Strickland in Sunset's name.

2. Barnes, manager of the consignee meat wholesaler in Chicago, a man of 28 years experience in the business whose knowledge of contemporary market conditions was positively established, testified on written interrogatories:

3. See Note 3 on page 497

tion. But, as is so frequent, the Judge, as would a jury, was entitled to, and presumably did, view the whole picture with a purpose of searching out, finding and acting on reality. The Court's findings which come here with the insulation of Fed.Rules Civ.Proc. rule 52(a), 28 U.S.C.A. showed that reality was something quite different.

The argument is made that since the confirmation of the oral purchase order from Consignee to Shipper stated that it was for two loads of "C and C cows 350/up, one rib on hind" and the shipping manifest revealed that eight of these carcasses were 300/350 pounds, there was no showing that what was *ordered* had been shipped, or that if it was the same kind, that it was in good condition. However, the intrinsic quality of the shipment was established by uncontradicted testimony of the United States Department of Agriculture Veterinarian Inspection at Shipper's plant. He attested to its quality and that it was in fit condition for shipment and human consumption. The Shipper's manager established that it complied with the order and Barnes, for the Consignee, note 2, *supra*, both expressly and circumstantially affirmed that the beef complied with the purchase order. Especially convincing was the latter. The shipping weight lists covering both of the two truckloads of beef reflect that one load contained ten and the other eight of the carcasses weighing 300/350 pounds. Notwithstanding this, the consignee accepted the first truckload without objection or complaint of any kind and Barnes categorically affirmed that that shipment was of the kind, type, quality and condition as ordered. Moreover, in the second truckload which arrived in damaged condition, approximately 2,000 pounds was from that very first shipment since the Carrier had taken it off the first truck because of overweight and had sent it back on the second trailer to be carried along with the second truckload.

■ These composite facts were certainly sufficient to warrant the Trial Court's drawing the inference that what had been shipped complied with the order. With that as a starting point the reference, in the questions seeking market value in good condition, see note 2, *supra*, to the commodity described in terms of *ordered* was but a convenient shorthand way of submitting the classic inquiry on the destination value had it arrived in good condition. Thus, there was no purpose either to offer or receive the evidence of this character as a basis for recovery of the contract price as distinguished from market value and which, absent special notice, would not be recoverable. 9 Am.Jur., Carriers, § 783; Fort Worth & Denver Ry. Co. v. United States, 5 Cir., 242 F.2d 702.

■ On the second facet, the record is equally sufficient. Actually, the Carrier's argument expands somewhat beyond the precise limits of its contention that market value of the defective beef was not established. For it begins with the usual rule that where goods are not totally destroyed, a shipper is ordinarily bound to accept the goods in damaged condition looking to the Carrier for the difference in value and may not reject them altogether. Strickland Transportation Co. v. American Distributing Co., 5 Cir., 198 F.2d 546; Robinson v. Geor-

---

"14. Q. What, in your opinion, was the reasonable cash market value in Chicago, Illinois, on July 27th, 1956, of meat of the kind, quantity and quality *ordered* by Columbia Packing Company from Lu-Tex Packing Company, Inc., for delivery in Chicago, Illinois, on that date?

  *    *    *    *    *    *

"14. A. 21¼ cents per pound."

To a similar question for value as of July 30, 1956, his answer fixed it at 21⅛ cents per pound.

3. Barnes also testified:

"17. Q. What, in your opinion, was the reasonable cash market value in Chicago, Illinois, on July 30th, 1956, of the shipment of meat which was tendered to Columbia Packing Company by Strickland Transportation Company?

"17. A. There is no way for me to know the actual cash value, because it would have been necessary to trim a great amount of the meat to see if there could be any salvage."

gia Savings Bank & Trust Co., 5 Cir., 106 F.2d 944; 9 Am.Jur., Carriers, § 560. From this position it moves forward to the next one which likewise has general application that the amount recoverable is the *difference* between the destination market value in good condition and in bad condition. Assuming that the Trial Court's finding of a destination market value of good condition has been satisfactorily established, as we have held it was, the Carrier urges that the second part of the equation—destination market value in damaged condition, has not been established. To this it adds a third rule of general acceptance that the mere price received on the sale of damaged goods is not proof of the requisite destination market value.[4]

But these are all rules of reason. They give way in the face of reason. Abundant reason is found in this record. When the second truckload arrived in Chicago, Barnes, for the Consignee, was present when the trailer was opened. What he and others found was described by the Court: "The meat had a bad odor and was in a slimy condition, and the tendered shipment was properly refused by [Consignee] because of its deteriorated condition." This precipitated extended telephone and telegraphic communications between Strickland's Chicago representative and the Shipper, between Shipper and representatives of Strickland and Sunset in Texas. After first demanding that Shipper give Carrier instructions on disposition of the goods then being held by it after rejection by Consignee, Strickland's representative in Texas, the terminal manager who had already handled the complaints the day after the second trailer had been loaded, advised Shipper that the meat would be taken care of properly, and that if necessary, Strickland would place the meat in cold storage. At about the same time, the terminal manager at the home base

of Sunset, the originating Carrier, after investigating the loss advised Shipper that the spoilage of meat resulted from the negligence of Strickland in reloading the meat and that Shipper should advise Strickland that Strickland was responsible to Shipper for the full value of the shipment.

■ The Shipper was certainly justified in acting upon these actions by the Carriers. And in the face of them, it was not compelled at the risk of forfeiting its entire damage claim to take redelivery of the merchandise itself. Had it, there is no showing at all that any good would have come from it for the Carrier exhausted the market for interested buyers and bids and even sought refrigerated warehouse space which was declined presumably because the beef was then under seal of the local public health and federal authorities pending laboratory inspection and report. Despite the strenuous efforts to locate buyers, only one party showed any interest, and after inspection of the beef in the trailer, this buyer bid and paid 5 cents per pound. The Carrier who had undertaken to and was handling the matter and who either knew or had the ready means of knowledge, made no effort to prove what this buyer used the beef for or what were the final reports of the City of Chicago Board of Health on the many samples it had taken for inspection.

■■ If the idea of a "market" value for meat that is thus spoiled, deteriorated, having obnoxious odors and appearance and generally in the unfit condition described by the Court is not incongruous, it is at least a question of fact. As a question of fact, it can be evaluated in a practical way. When these strenuous efforts to find willing buyers or bidders failed altogether, when the beef could not even be put into warehouses presumably because of the bad name it had acquired from the health

---

4. The Carrier stresses heavily: Railway Express Agency v. McCarrick, Tex.Civ. App., 69 S.W.2d 803 (no writ); Thompson v. A. J. Tebbe & Sons, Tex.Civ.App., 241 S.W.2d 627 (no writ); Thompson v. A. J. Tebbe & Sons, Tex.Civ.App., 241 S.W.2d 633 (no writ); Texas Mexican Railway v. Slaughter, Tex.Civ.App., 241 S.W.2d 749 (no writ).

authority seals, when the Consignee had rejected it as unfit, there was enough for the Court to conclude, as it did, that it had only "a salvage value of * * * 5 cents a pound, which was the best price obtainable." That finding, in this context, was the equivalent of a holding that it had no market value as such. In that situation, what is received on the only and best price obtainable may be the basis for measuring the difference. Jancik v. Thompson, Tex.Civ.App., 241 S.W.2d 639 (error refused, n. r. e.); Texas Mexican Ry. Co. v. Slaughter, Tex.Civ. App., 241 S.W.2d 749 (no writ history); Texas & N. O. R. Co. v. Searcy, Tex. Civ.App., 220 S.W.2d 366 (error refused, n. r. e.).

Little need be said of the second point. Were it error to have excluded the U. S. Department of Agriculture form, it would certainly not have been harmful, F.R.Civ.P. 61. This form was a sort of punch card for IBM machine accounting use. Except for undecipherable machine accounting symbols, all it stated was that 1435 pounds of beef was tainted and denatured to make it unfit for consumption. It did not, as Carrier claims, show how much of the truckload had been examined, or how much in all had been rejected. The effort to overcome this substantive deficiency by tying the matters appearing on the written form into the oral inquiry made by the Carrier's representative to the Department of Agriculture Inspector makes it all the more palpable hearsay. But it was not admissible on this showing. Assuming *arguendo* that it might have been a record within 28 U.S.C.A. 1731–1745, it was not certified as required, F.R.Civ.P. 44(a), and nothing brings it within the alternatives of 44(c).

This brings us to the third and last point on the negligence of the Carrier. Conceding as it must that under applicable tariffs and the affreightment contract, the burden was on it to exculpate itself from the presumption arising from receipt in good order and delivery in bad order, Carrier insists that it fully met this burden. It did with meticulous detail by flesh and blood witnesses and records account for the trailer from the time of its first dispatch until the beef was rejected in Chicago. We agree that this showing and other testimony would make some of the findings of negligence doubtful, and perhaps insupportable as clearly erroneous. But as we view it, only one of these was essential, and on it, there was an abundance of evidence.

The second trailer was loaded on the 25th of July. It left the Shipper's plant in the late afternoon. On arrival in Strickland's yard at San Antonio, it was found to be overweight in the sense of distribution of weight for axle loadings as tested by the various states through which Carriers' regular I.C.C. route would run. Instead of notifying Shipper of this so that the trailer could be taken back to its plant at nearby Luling for reworking and reloading where chill boxes and facilities would be available, Carrier undertook to do this at its own dock. This meant that on the following hot, July, Texas morning, both of the doors of the trailer were open for half an hour and were half way open for another hour and a half to two hours. In addition, the beef quarters were hung so closely together that to rearrange cargo, it was necessary to take 15 to 20 pieces out and leave them for 20 minutes or so on the dock with no refrigeration. During part of this time, the trailer's freezer unit continued to operate, but for an hour or more, it was defrosting. According to witnesses whose experience was sufficient to allow them to form a judgment if the Court credited their testimony, this would result in the temperature inside the trailer being raised considerably. This would likewise permit the temperature of the beef, loaded initially with a temperature of 40 to 45 degrees, to rise. That the temperatures were again lowered and maintained during the long trip to Chicago was of no consequence, since putrefaction is the result of bacterial action which, if once started in meat that is not frozen, is not arrested.

To be sure, there was controversy on this score. But the inferences were for

the District Court who had presided over a trial in which, except for the Barnes' deposition, all of the testimony came from witnesses who could be seen and heard and judged. That is the function of a Trial Court. That function was carefully performed under proper standards. There it ends.

Affirmed.