F. J. McCARTY COMPANY, Inc., Plaintiff,

v.

SOUTHERN PACIFIC COMPANY, Defendant.

No. 46592.

United States District Court
N. D. California.

Aug. 7, 1968.

William H. King, Hamilton & King, San Francisco, Cal., for plaintiff.

Waldron A. Gregory, Frederick E. Fuhrman, San Francisco, Cal., for defendant.

## MEMORANDUM OPINION

ZIRPOLI, District Judge.

### FACTS

This is an action by a consignor against an interstate carrier for damages occasioned by the carrier's delivery of a damaged cargo. The consignor alleges that on two occasions a cargo of grapes was injured while being transported by the carrier and that the injury to the cargo caused the damages sought to be recovered.

The plaintiff—F. J. McCarty Co., Inc.—is an exporter of perishable agricultural products such as fresh fruits. Miss Frances J. McCarty is the president and sole owner of the plaintiff.[1] She has one employee. Two shipments of grapes are involved in this case.

Plaintiff entered into the contract for the first shipment with Frutas San Martin C. A.—a South American importer—on June 27, 1966 (Exh. 1). Plaintiff agreed to deliver 1,330 lugs or boxes of Cardinal grapes to Caracas, Venezuela. Plaintiff was to receive $6.60/lug (Exhs. 1, 7). The grapes were to be shipped on July 8, 1966 from New York. Plaintiff purchased the grapes from Guimarra Vineyards near Bakersfield, California, for $4.05/lug on June 29, 1966 (Exhs. 2, 5). On June 29, 1966, a United States Department of Agriculture inspector at Edison, California checked the grapes and found them in good condition (Exh. 3). The grapes were shipped pursuant to a Uniform Domestic Straight Bill of Lading (Exh. 4) and were marked "Expedite for Export".[2]

Although the grapes were carried by various rail carriers and were handled by at least one trucker and one loading contractor, the parties are agreed that any liability arising as a result of the acts of the aforementioned entities must be borne by Southern Pacific.[3]

The grapes were to be delivered to Pier 58, North River, New York, New

---

[1] This opinion will refer to the company and its president interchangeably as "McCarty" or "plaintiff".

[2] The only significance of the words in this case is that the defendant accepted the shipment with knowledge that the grapes were destined for another country. The relevance of the knowledge as it may affect the carrier's damages or liability is discussed below.

[3] In other words, any physical damage to the grapes or lugs was caused by Southern Pacific or by entities best characterized as Southern Pacific's agents which are collectively referred to herein as "defendant". That Southern Pacific must bear the liability that does exist is not disputed, see 49 U.S.C. § 20(11), which in pertinent part reads as follows:

§ 20, par. (11). *Liability of initial and delivering carrier for loss;* * * * Any common carrier, railroad, or transportation company subject to the provisions of this chapter receiving property for transportation from a point in one State * * * to a point in another State * * * shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States * * * and no contract, receipt, rule, regulation, or other limitation of any character whatsoever shall exempt such common carrier, railroad, or transportation company from the liability imposed; and * * * any common carrier, railroad, or transportation company delivering said property so received and transported shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon * * * for the full actual loss, damage, or injury to such property caused by it or by any such common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States * * * notwithstanding any limitation or liability or limitation of the amount of recovery or representation or agreement

York for shipment to South America on board the Grace Line vessel S.S. Santa Rosa (Exhs. 2, 4).[4]

The exact day on which defendant was to deliver the grapes to the consignee was to be disclosed to the railroad by Gotham Shipping Co., plaintiff's agent and "freight forwarder" in New York. George Ziegler, president of Gotham, kept track of plaintiff's shipments as they neared New York and was responsible for making necessary arrangements at the point of destination. On behalf of the plaintiff, he dealt with the Pennsylvania Railroad, the final rail carrier involved in the transaction, and for whose conduct the defendant is responsible.[5] On July 5, 1966, Ziegler gave the railroad written instructions concerning the delivery to Pier 58 (Exh. E). The grapes arrived at the Greenville, New Jersey railroad yards of the Pennsylvania (also referred to as the Greenville Piers or Greenville) on July 6, 1966. Greenville Piers was the defendant's customary yard to which goods to be exported were shipped. The vessel—the S.S. Santa Rosa—was to sail on Friday, July 8, 1966. The ship was customarily loaded at Pier 58 on the day prior to sailing. While at the Greenville Piers, the grapes were removed from their refrigerated rail car and were loaded on a refrigerated truck[6] of the H. W. Thompson Co. for delivery to Pier 58. The unloading and loading took from 11:30 p. m. on July 6 to about 3:30 a. m. on July 7. The unloading and loading while in the railroad yard was done by the New Jersey Contracting Co. At about 8:15 a. m. on July 7, the Thompson Co. truck left the Greenville yard for Pier 58, a distance of about fourteen miles by truck. Frank Cuomo, the truck driver, and his "helper"[7] arrived at Pier 58 at about 9:00 a. m. They began unloading the 1,330 lugs of grapes between 9:45 and 10:30 a. m. After they had unloaded between 140 and 195 lugs, Harry E. Jennings—a "surveyor" employed by the T. D. Baker & Co., which is in turn employed by the Grace Line to inspect cargo being delivered for loading on board ships—told them he would recommend that Grace Line reject the shipment

as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; * * *.
See generally, Missouri Pacific R.R. Co. v. Elmore & Stahl, 377 U.S. 134, 84 S. Ct. 1142, 12 L.Ed.2d 194 (1964).

4. The Grace Line will be referred to herein as "consignee".

5. See note 3 supra.

6. Defendant's witness Frederick W. Holmes —Pennsylvania's Greenville foreman in charge of delivering cargo to ships for export—testified that approximately 10% of deliveries are by truck and 90% by "float" or barge. When delivered by float, the railroad car itself is floated from Greenville to Pier 58 (see Exh. D). Consequently, the car's cargo need be unloaded only once, i. e. at Pier 58, whereas when a truck is used, the cargo is handled twice—once at Greenville when transferred from train to truck and once at Pier 58 when transferred from truck to pier. Also, apparently, when delivery is made to the Grace Line's float-receiving facility, as opposed to the truck-receiving dock, there is sufficient space in which to separate bad from good or undamaged lugs and such separation is frequently done under the eye of Grace Line's agent. Defendant contends that while separation is practical when under direction of the consignee's agent, it is impractical to do so where a refused shipment is returned to Greenville because the railroad would not know if the consignee would thereafter accept the shipment and because Thursday evening (the day on which the first shipment returned to Greenville) is the busiest day at Greenville. The court concludes that the above testimony is irrelevant to the issues in this case because truck delivery was a common mode of transport to which everyone consented and expected to be used and because in no way can plaintiff be said to have "assumed any risk" or interfered (by choosing truck delivery) with the defendant's performance of any contractual duty or promise. Nor does the court consider relevant Holmes' testimony that the railroad never informed a consignee that a cargo was damaged.

7. The driver and helper do the unloading at the Grace Line's pier.

because of damage to 10 to 15 per cent[8] of the lugs and grapes.[9] His estimate was based on an examination of the part of the shipment unloaded and an examination of the manner in which the lugs were sorted on the truck. Cuomo contacted his boss, Harold W. Thompson, who instructed him to return to the Greenville Piers, which he did, arriving at about 1:00 p. m. on July 7. Meanwhile, Jennings had contacted George Ziegler[10] of Gotham Shipping, plaintiff's agent in New York, and told him of his observations and decision. Arrangements were made whereby Grace Line agreed to take the grapes on the morning of sailing if the damaged lugs were separated from the undamaged ones. Jim Mabin, Grace Line's pier manager, had told Ziegler that no space was available on the pier to use for separating the good and bad lugs and plaintiff and her agents had no time on the afternoon of July 7 to secure facilities and personnel to accomplish the required separation. Consequently, Ziegler called Holmes at Greenville and told him of the situation.[11] Ziegler ultimately ordered the railroad car and its contents turned over to Victor Joseph & Sons, Inc., who would sell the grapes at auction.[12]

Plaintiff entered into the contract for the second shipment with Frutas San Martin C. A. on July 20, 1966 (Exh. 10). Plaintiff agreed to deliver 500 lugs of seedless, 500 lugs of Cardinal, and 500 lugs of Ribier grapes—1500 boxes in all —and was to receive $5.80, $5.55 and $7.-60/lug respectively. The grapes were to be shipped on July 29, 1966 from New York on the Grace Line vessel S. S. Santa Paula. Plaintiff purchased the grapes from Guimarra for $3.25, $3.00 and $5.-00/lug respectively on July 20, 1966 (Exhs. 11, 12). On July 20, 1966, a United States Department of Agriculture inspector at Edison, California, checked the grapes and found them in good condition (Exh. 13). The grapes were shipped pursuant to a Uniform Domestic Straight Bill of Lading (Exh. 14)[13] marked "Expedite for Export".[14] The actual procedures and details for the second shipment's handling were similar to those of the first shipment (E. g., Exhs. G, H). The grapes arrived at Greenville on July 27, 1966, and were to be loaded on the S.S. Santa Paula on July 28 for sailing on the 29. The grapes were transferred to a Thompson Co. truck (at which time no damage was

---

8. Exh. 20 (report of T. D. Baker & Co. of July 7, 1966) ; Exh. 21 (Grace Line dock receipt) ; Exh. B (Railroad Perishable Inspection Agency report) ; JENNINGS DEPOSITION 46.

9. Whether the damage was caused by the shifting of the load while moving across country in the boxcar (Exh. F) or when loaded into the truck at Greenville (JENNINGS DEPOSITION 47; ZIEGLER DEPOSITION 20) does not matter, since it is agreed that defendant bears the responsibility in either case.

10. Ziegler, in turn, notified McCarty by phone and telegram (Exh. 8). Ziegler also wrote to the Pennsylvania Railroad notifying it of plaintiff's claim and requesting that the grapes not be sold at the New York Fruit Auction (Exh. 9). Although the letter (and the bill of lading) refer to Guimarra Vineyards as the shipper, the parties do not dispute that McCarty had obtained title to the grapes at the time they were shipped and that Guimarra was merely acting for McCarty.

11. Whether Ziegler specifically requested that the railroad separate the good and bad lugs is disputed. Since the court concludes that defendant would have had no such duty even given a request, the court does not resolve the factual dispute, for the answer is irrelevant.
    In concluding that the railroad had no duty to sort, the court in no way relies upon Exh. A (New York Harbor Tariff 116–G, Item 4410(f)) and expresses no opinion on the question of when, if ever, such a duty might descend upon a carrier to do more than tender the shipment to the consignee at the time and place designated and to act as a "warehouseman" thereafter.

12. A report (Exh. 25) of an inspection performed for the auctioneer on July 10, 1966, confirms the damage noted at Pier 58, see note 8 supra; see also Exh. 26.

13. See note 3 supra.

14. See note 2 supra.

noted, Exh. H [15] and were driven to Pier 58 where the shipment was refused in the early afternoon. Frank Cuomo, defendant's agent who tendered delivery as driver of the truck, testified that the consignee refused [16] the shipment before any of the lugs had been unloaded.[17] The reason given Cuomo was "possible damage", although the surveyor did note some actual damage (Exh. 18; cf., Exh. 22).[18] Cuomo testified that the surveyor could see only the last tier of lugs which was stacked to a height of about ten to eleven feet above the ground on which the surveyor stood. The truck returned to Greenville on the 28 of July and the grapes were reloaded into the refrigerated rail car from whence they came. On July 31, the rail car was placed aboard a barge or float and was moved to Pier 28 for delivery to the New York Fruit Auction, which ultimately sold the grapes. When Ziegler was notified that the surveyor at Pier 58 would not recommend acceptance of the second shipment, he spoke with Jim Mabin, who refused to allow the sorting of good and bad lugs on the pier. Mabin did say that the consignee would accept the shipment on the morning of sailing if properly separated. Plaintiff claims that defendant, in injuring the shipments, caused and is liable for the following damages:[19]

For the first shipment, plaintiff would have received $8,778.00.[20] Plaintiff saved the ocean freight charge to South America of $1,369.90 [21] and the ocean insurance charge of $28.97.[22] Therefore, had the first shipment been carried to South America, plaintiff would have net receipts of $7,379.13.[23] Instead, plaintiff

15. Compare Exh. F (comparable report for the first shipment.)

16. The parties do not dispute that for all practical purposes the word of the surveyor of T. D. Baker & Co. is the word of Grace Line, although the consignee is not bound in any way by the surveyor's recommendation. (REARDON DEPOSITION 4, 6).

17. Cuomo did testify that on occasion a shipment would be rejected merely because of the way it was loaded. He further testified that rarely would he actually separate bad from good cargo, though on one occasion he did and it took him eleven hours. In response to the question of whether he voiced any objection to the refusal of the shipment, he replied that he did not because he didn't "look good floating in the East River".

18. Of much less relevance is Exh. 19 (see also Exh. 27) which is a report made of an inspection of the second shipment which was conducted three days later for the auctioneers. The report indicates that the shipment was actually damaged. The court attaches little significance to Exh. 19 because the grapes, following the examination reflected in Exh. 18, were moved and unloaded from the truck and reloaded onto the rail car and the subsequent movement could have been responsible for the damage reflected in Exh. 19. For the reasons stated in this opinion, the court deems the condition of the grapes at the time the consignee refused them to be the more significant fact.

It should be noted, however, that any damage accruing after refusal has not been shown to be anything but unavoidable. Finally, Exh. 19 does not dispute the findings of Exh. C, another inspection report of an examination subsequent to the consignee's refusal, which indicates ultimate damage to only 16 lugs.

19. Defendant concedes its liability for the actual damage it caused as carrier up to the time the shipments were tendered to the consignee at the time and place designated by plaintiff and her agents. Defendant denies liability for any damages accruing after the consignee refused to accept the shipment, and if such liability is found, denies that the proper measure of damages is, as plaintiff contends, determined by the contract price which plaintiff was to receive from South America.

20. 1,330 lugs at $6.60/lug.

21. 1,330 lugs at $1.03/lug.

22. $0.30 per hundred dollars of valuation. Plaintiff insured for 10% above the contract price or for $8,778.00 plus $877.80. Therefore, insurance on a value of $9,656.00 would be 96.56 hundred dollars at $0.30/hundred.

23. $8,778.00 less $1,369.90 less $28.97. The figures assume, of course, that plaintiff could collect the full amount for 1,330 lugs despite the fact that part of the shipment would have arrived either damaged or not at all. Some adjustment, even of plaintiff's figures, is therefore necessary.

received $1,337.14 [24] from the auction and hence claims damages of $6,041.99.

For the second shipment, plaintiff would have received $9,475.00.[25] Plaintiff saved the ocean freight charge of $1,545.00 [26] and the ocean insurance charge of $31.27.[27] Therefore, had the second shipment been carried to South America, plaintiff would have had net receipts of $7,898.73.[28] Instead plaintiff received $3,537.76 [29] from the auction and hence claims damages of $4,360.97.

Defendant concedes that it is liable as to the first shipment for the injury to 147 boxes with crushed tops and 14 boxes with open tops. Defendant concedes liability as to the second shipment for the injury to 16 boxes. Defendant concedes liability for $278.32 for the first and for $54.80 for the second shipment. Defendant contends that if additional liability is imposed, the proper measure of the plaintiff's loss should be determined not by the contract price in South America but by the market value of the grapes in New York. Defendant has submitted Exhibits N–P summarizing its theory of damages. Plaintiff does not contest the accuracy of the computations but does say that the measure is not correct.

## DISCUSSION

■ The court has subject matter jurisdiction of this action, 28 U.S.C. § 1337; 49 U.S.C. § 20(11); Peyton v. Railway Express Agency, 316 U.S. 350, 62 S.Ct. 1171, 86 L.Ed. 1525 (1942); Eazor Express v. Pennsylvania Railroad Co., 214 F.Supp. 695 (W.D.Pa.1963).

■ Although plaintiff urges the court to hold that the defendant bore the legal duty to separate the undamaged from the damaged cargo, the court is satisfied that the law imposes no such duty upon the carrier. Rather, in a case such as this one, the duty is on the consignee to accept the tender of the partially damaged shipment and to thereafter mitigate damages. See Sunset Motor Lines, Inc. v. Lu-Tex Packing Co., Inc., 256 F.2d 495, 497 (5th Cir. 1958); Republic Carloading & Distributing Co. v. Missouri Pacific R.R. Co., 302 F.2d 381, 386 (8th Cir. 1962).

■ The consignee's duty appears to be based on the theory that since the carrier's liability and standard of care is already so great [30] that it would be unjust to continue to impose so great a burden after the carrier tenders the goods at the time and place ordered. However, the wrongful refusal of the consignee to accept delivery, standing alone, does not compel the result that plaintiff may not recover her claimed damages.[31] She cannot recover only if different reasonable action by the consignee or her agents could have mitigated the damage.[32]

24. Exh. 30. However, a portion was deducted from the auction proceeds to pay the rail freight from California to New York. Since that charge would have been paid by plaintiff had the shipment gone through to South America, plaintiff cannot recover that amount. Hence, the claimed damages must be reduced by the amount of the railroad freight reflected in the check received from the auction company. (LIGHTER DEPOSITION 6–7).

25. 500 lugs at $5.80/lug plus 500 lugs at $5.55/lug plus 500 lugs at $7.60/lug.

26. 1500 lugs at $1.03/lug.

27. The value plus 10% is $9,475.00 plus $947.50. The insurance is therefore on 104.23 hundred dollars at $0.30/hundred.

28. $9,475.00 less $1,545.00 less $31.27. See also note 23 supra.

29. Exh. 31. See also note 24 supra.

30. "[T]hough not an absolute insurer, [a carrier] is liable for damage to goods transported by it unless it can show that the damage was caused by '(a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods.'" Missouri Pacific R.R. Co. v. Elmore & Stahl, supra 377 U.S. 137, 84 S.Ct. 1144 (1964).

31. With appropriate adjustments, of course, as previously indicated in notes 23, 24, 28 and 29 supra.

32. Such a result appears not only reasonable and just but would appear to follow from the words of 49 U.S.C. § 20(11) and from the common law rule that contract damages may be recovered to the extent they could not be avoided by rea-

■■ As to the first shipment, the court finds that no reasonable action [33] by the consignee would have eliminated the damage claimed by the plaintiff. By the time the shipment had been refused, it was the afternoon of July 7. The ship was to sail on the 8th of July. The evidence adduced at trial warrants no conclusion other than that neither the plaintiff, her agents nor the consignee had the space, the facilities, the time or the personnel to segregate the bad lugs from the good. In no way could reasonable action have lessened plaintiff's loss even had the consignee accepted delivery. In holding that the refusal is therefore irrelevant to the issue of damages, even though the refusal was wrongful, the court notes the observations in note 32 supra and that in similar situations, courts have taken a comparable approach. In Atlantic Coast Line Railroad Company v. Tifton Produce Company, 179 Ga. 624, 176 S.E. 624, 96 A.L.R. 772 (1934), a load of watermelons had depreciated in value due to the carrier's delay in transportation. The consignee refused the shipment at the destination. In permitting recovery by the shipper (who was also the consignee), the court stated "the shipper's right of action for the damage caused by the delay is not defeated by the fact that he improperly rejected the shipment * * *. The damage by delay *had already accrued* at the time of such rejection and refusal, and his failure to accept the shipment * * * *was in no wise responsible for such damage.*" See also Whittington v. Southern R. Co., 172 N.C. 501, 90 S.E.

505 (1916) (goods damaged in transit): "[W]e see no reason for denying this recovery because of refusal to receive the shipment when this has *in no way increased the liability of the defendant.*" The analysis adopted by this court proceeds on the factual finding that the Grace Line could not have done anything reasonably to reduce the damage to the plaintiff. As to the second shipment, the court finds that had the consignee accepted delivery, reasonable conduct thereafter *could* have mitigated the damages. The ultimate injury to the second shipment was only to 16 lugs, see note 18 supra, and assuming that it had all accrued at the time of delivery, only 16 out of 1500 lugs were damaged at that time, contrasted with 10 to 15 per cent damage to the first shipment. The court concludes that it would have been reasonable to ship the second shipment to South America. Surely 1484 good lugs out of 1500 lugs of a perishable commodity would be substantial performance of the contract with Frutas San Martin C. A. The Grace Line rejected the second shipment before any of it had been unloaded at Pier 58, unlike the first shipment. Had it accepted delivery and more carefully examined the cargo, it would have discovered the miniscule extent of the damage, and it might not have been an unreasonable burden to separate bad from good as an alternative to shipping the cargo. The court finds that because of the difference in the extent of damage to the two shipments that what would have been reasonable for the consignee to have done with the first would not neces-

sonable mitigation. Section 20(11) states that the carrier shall be liable for the loss "caused by it". To the extent that reasonable action following acceptance by the consignee could not have avoided the resultant damage, the loss to plaintiff would seem to have been caused by the defendant. Cf., United States v. Reading Co., 184 F.Supp. 206, 209 (E.D.Pa.1960); see also 5 WILLISTON, CONTRACTS (rev. ed.) § 1353 (p. 3795).

The burden of proof rests with the party seeking to prove that mitigation was possible. In this case, the defendant must show how plaintiff or the consignee might

have mitigated the losses claimed. While the court's conclusions are made with this burden in mind, the court notes that none of the findings concerning the reasonableness of mitigation would be different on the facts of this case even were the burden of proof on plaintiff to show that mitigation was possible.

33. "The carrier can ask no more than that the consignee act reasonably in mitigating damages * * *", Secretary of Agriculture v. United States, 350 U.S. 162, 172 n. 20, 76 S.Ct. 244, 251, 100 L.Ed. 173 (1956).

sarily have been reasonable with the second. A considerable portion of the first shipment was known to be damaged. The decision not to transport so substantially damaged a cargo to South America cannot be said to be unreasonable.

As for the measure of damages, the court agrees with the defendant that the general rule is to award the market value of undamaged goods at the point of destination less the market value [34] of the damaged goods, Olsen v. Railway Express Agency, Inc., 295 F.2d 358, 359 (10th Cir. 1961). But where another rule better measures plaintiff's "full actual loss" (the terms used in § 20(11), 49 U.S.C.), the market value test should be discarded and the test adopted which best measures the damages, Olsen v. Railway Express Agency, Inc., 295 F.2d 358, 359 (10th Cir. 1961) ("The change in market value is not, itself, the statutory liability imposed * * *. The nature of the property damaged may * * * clearly indicate that change in market value does not compensate for actual loss. * * *"), Great Atlantic & Pacific Tea Co., Inc. v. Atchison, Topeka and Santa Fe Ry. Co., 333 F.2d 705, 708–709 (7th Cir. 1964) ("[T]he fair market value rule is not applied when actual damage can more nearly be ascertained by other means."); cf., Process Equip. Co., Inc. v. Denver Chicago Trucking Co., 275 F.Supp. 698 (D.Mass.1967), even though the plaintiff thereby receives his "special damages" or lost profits, L. E. Whitlock Truck Service, Inc., v. Regal Drilling Co., 333 F.2d 488 (10th Cir. 1964). Plaintiff contends his damages should be measured by his contract price he would

have received in South America. The court agrees. Not only were the bills of lading marked so that the railroad knew they were destined for export, but these damages are not speculative or remote. Indeed, they are more definitely related to the grapes damaged than the more speculative market values which defendant contends existed in New York. The contract price was used as the proper measure in United States v. Northern Pacific Ry. Co., 116 F.Supp. 277 (D.Minn. 1953). Defendant would reject that case as controlling because the contract price there was less than the market price. But the court there used the contract price for the express purpose of compensating plaintiff for its actual loss, the result demanded by the statute (49 U.S.C. § 20(11)). To reward the shipper because of the fortuitous market price makes no more sense than to punish the shipper who had a good contract for his goods. The purpose of the damage award is to compensate the plaintiff and if the plaintiff proves her loss she should receive damages to that extent.

## DETERMINING DAMAGES

Had the second shipment been shipped to South America, as the court has determined would have been reasonable, plaintiff would have received her contract price less an offset to which Frutas San Martin would have been entitled because of the damage to the 16 lugs of grapes. Therefore, had the consignee mitigated the damages, plaintiff would have lost only an amount represented by the contract price for 16 lugs less the market value of the 16 damaged lugs in Caracas, Venezuela.[35] Because the evidence does

---

34. Since plaintiff does not contest the accuracy of defendant's figures assuming this measure to be appropriate in this case, the court expresses no opinion as to whether, if market value were deemed the appropriate measure, such calculations (Exhs. N–P) are sufficient to establish a relevant market value. See Lapidus v. Chicago, Burlington & Quincy R.R. Co., 161 F.Supp. 664, 667 (N.D.Ill.E.D.1958) (failure to link values with qualities of specific goods damaged does not meet

requisite burden of proof); compare Meltzer v. Pennsylvania R. Co., 29 F. Supp. 840, 842 (E.D.Pa.1939). Rather, the court holds that plaintiff has met his burden of establishing damages under an alternate but proper theory.

35. Actually, such a measure assumes that all the lugs would have been shipped to South America, that the buyer would have been entitled to reject the damaged lugs, that the seller would have sold

not disclose the variety of grapes in the 16 damaged lugs, the court will assume that they had an average price of $6.31.[36] Plaintiff would have received $100.96. No evidence of the market value in Caracas exists in this case. The court finds that a reasonable market value would have been $5.00.[37] Hence, plaintiff is entitled to damages of $20.96 for the second shipment.

As for the first shipment, plaintiff would have been entitled to receive the contract price of $8,778.00 less the offset due to 161 damaged lugs. The only market value evidence in the record is that the damaged lugs had a market value of $5.09 (Exh. N). Hence the offset would be $1.51 per damaged lug or $243.11. Plaintiff would have received $8,534.89. Plaintiff received from the auction $2,309.63 (see Exh. 30 and note 24 supra [the freight is not chargeable to defendant which is the result if plaintiff's figure of $1,337.14 is used]). Because the grapes were not shipped, plaintiff saved $1,398.87 (notes 21 and 22 supra). Hence, plaintiff may recover $4,826.39 ($8,534.89 less $2,309.63 less $1,398.87) as damages for the first shipment.

Plaintiff is entitled to and is hereby granted judgment for damages in the sum of $4,847.35, with each party to bear its own costs.

The foregoing constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) Fed.R.Civ.P.

them at auction in Caracas, and that the buyer would not have purchased replacements at all or that replacements would not have cost him more than $6.31 (see note 36 and accompanying text). While the assumptions are somewhat artificial, the evidence does not permit a more detailed analysis. Even if the assumptions are not all correct, the effect on damages is not too great. For example, if only the good lugs would have been shipped, the seller would have sold the damaged ones in New York instead of Caracas.

36. One third of the sum of $5.80, $5.55 and $7.60. See note 25 supra and accompanying text.

37. One third of the sum of $4.48, $4.255 and $6.26. The figures are the market values suggested by defendant of the various grapes in the second shipment at New York on July 28, 1966. The court finds that no better market value evidence is available in this case.