FRASER–SMITH COMPANY, Farmers Elevator Company of Traer, Iowa, and Johnson Feed and Grain Company, Appellees,

v.

CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY, Appellant.

No. 20276.

United States Court of Appeals,
Eighth Circuit.

Jan. 5, 1971.

Rehearing Denied Jan. 27, 1971.

A. James Dickinson, Stringer, Donnelly, Allen & Sharood, St. Paul, Minn., for appellant.

James H. Malecki; Gislason, Alsop, Dosland & Hunter, New Ulm, Minn., for appellees.

Before MATTHES, Chief Judge, and LAY and BRIGHT, Circuit Judges.

LAY, Circuit Judge.

This is an appeal by a common carrier, the Chicago, Rock Island and Pacific Railroad from judgments in favor of Fraser-Smith Company (a grain broker) and Farmers Elevator Company of Traer, Iowa, and in favor of Fraser-Smith Company and Johnson Feed and Grain Company in the respective sums of $5,018.14 and $2,567.82 both with interest and costs. The issues are significant. Jurisdiction is premised under 49 U.S. C.A. § 9.

The claims arise from the shipping of three carloads of freshly shelled corn in November 1966, by the plaintiff grain companies, two from Traer, Iowa, and the other Montezuma, Iowa, to themselves as consignees in Davenport, Iowa, via the Chicago, Rock Island and Pacific Railroad. The method of shipment followed an established business practice between the parties. The grain was sold on contract by bill of lading and sight draft to Fraser-Smith, a grain brokerage company, having its principal place of business in Cedar Rapids, Iowa. Upon arrival at its destination Fraser-Smith was to be notified and, upon acceptance of the grain, the sight drafts would be honored. Fraser-Smith in turn would sell the grain under open contracts which it had with various parties. Upon arrival in Davenport, the corn was inspected by a licensed grain inspector who graded the shipments as follows:

1. D & H car 17825: sample grade yellow corn, 52.5 lbs. per bu., 21.5% moisture, 8.3% damaged kernels, 1.0% broken corn and foreign material.

2. GTW car 515319: sample grade yellow corn, 52 lbs. per bu., 20% moisture, 4.8% damaged kernels, 2% broken corn and foreign material.

3. Milw. car 23062: sample grade yellow corn, 53 lbs. per bu., 21.5% moisture, 4% damaged kernels, 1% broken corn and foreign material.

An added description on each report reads, "odor-sour" and "heating." The corn shipped from Traer was delayed in transit ten days and the corn shipped from Montezuma was delayed six days. The evidence supports the trial court's finding that the delay was a contributing factor to the corn heating and turning sour.

The grading reports were then phoned to Mr. Smith of Fraser-Smith in Cedar Rapids. Smith immediately called the shippers and recommended that they reject the shipments. Both shippers agreed to abide by Smith's recommendation and Smith was given the authority, as their agent, to notify the railroad. Smith wired the railroad to this effect and also gratuitously offered to help the railroad sell the damaged corn. The evidence showed that the railroad did not respond to Smith's offer and some 15 days later sold the corn for salvage in Oskaloosa, Iowa. Each carload was sold for less than $500. The present suit sought recovery for the fair market value of the corn as shipped, less freight charges, plus interest from the dates of rejection.

Two basic issues are presented: (1) whether the shippers were obligated to give special notice to the carrier that the corn contained a high moisture content when shipped, and (2) whether the shippers-consignees wrongfully rejected the corn. Fraser-Smith paid the sight drafts and the evidence showed that it considered the money advanced on the drafts (less than the total contract price) to be in the form of a loan. Both grain companies acknowledged this indebtedness to Fraser-Smith.[1]

The district court sitting as a trier of fact found that the corn "did not contain an inherent vice of a magnitude greater than that ordinarily possessed by a substantial number of shipments of corn at that time of year and the carrier as well as the shipper knew or should have known the possible mois-

ture content of said shipment." There exists sufficient evidence to support this conclusion. Once it was proven that the corn was in a damaged condition upon its arrival in Davenport, the railroad had the burden of proving that the damage was caused by the inherent nature of the goods rather than its own admitted delay of transit. See Missouri Pac. R. R. v. Elmore & Stahl, 377 U.S. 134, 138, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964). It is well settled that a carrier is not responsible for damage to a shipment caused solely by the operation of natural laws upon it. Trautmann Bros. Co. v. Missouri Pac. R. R., 312 F.2d 102 (5 Cir. 1962); Austin v. Seaboard Air Line R. R., 188 F.2d 239 (5 Cir. 1951); Scott County Milling Co. v. Thompson, 255 S.W.2d 121 (Mo.App.1953). Where the peculiar nature of the shipment has an inherent vice which the carrier cannot be held to normally anticipate or foresee, the rule is fundamental that the carrier cannot be liable for any damage which may have ensued peculiar to that vice. Illustrative is the case of Gardner v. Mid-Continent Grain Co., 168 F.2d 819 (8 Cir. 1948). This court held that soybeans being unnaturally damp from water used to extinguish a fire in a warehouse where they had been stored was a fact requiring special notice and knowledge to the carrier before liability could be imposed upon it for spoilage. The rule of *Gardner* is similar to the law requiring notice to predicate liability for *special damages* growing out of a breach of contract. Cf. Meyer v. Thompson, 284 S.W.2d 384 (Tex.Civ. App.1955); Czarnikow-Rionda Co. v. Federal Sugar Refining Co., 255 N.Y. 33, 173 N.E. 913, 88 A.L.R. 1426 (1930).

The facts here establish, however, that the corn shipped was no different than many other similar shipments of wet corn in the fall of the year. The railroad agents were fully aware that corn shipped at this period of time contained a higher percentage of moisture than

---

1. No issue was apparently raised in trial court as to whether Fraser-Smith was a real party in interest and for that reason we do not go into the question.

usual but had not specifically inquired concerning it and did nothing about it. See Missouri Pac. R.R. v. Elmore & Stahl, supra, 377 U.S. at 143–144, 84 S. Ct. 1142. The evidence supports the finding that the damage to the shipment, upon its late arrival in Davenport, although caused by the operation of natural laws upon it, would not have occurred if the carrier had not negligently delayed its shipment. Here the decay of the grain was not a "cause"; it was an "effect." [2]

■ This then brings us to the more troublesome issue concerning the rejection of the goods and the damages that were found against the carrier. The law is well settled that where goods are shipped by common carrier and become damaged in transit, the consignee nevertheless has the duty to accept the shipment. Under such circumstances the consignee's obligation is not affected by the fact that the goods have been injured or damaged during transit, unless they are considered to be "totally worthless." Sunset Motor Lines, Inc. v. Lu-Tex Packing Co., 256 F.2d 495 (5 Cir. 1958); Strickland Transp. Co. v. American Distrib. Co., 198 F.2d 546 (5 Cir. 1952); Robinson v. Georgia Sav. Bank & Trust Co., 106 F.2d 944 (5 Cir. 1939); Clifford v. Merritt-Chapman & Scott Corp., 57 F.2d 1021 (5 Cir. 1932). See also Biltmore Mfg. Co. v. Overnite Transp. Co., 157 F.Supp. 891 (W.D.N.C. 1958); Miller's Law of Freight Loss and Damage Claims, ch. 5 § E (3rd ed. 1967) (hereinafter cited as Miller's). There are many practical and sound reasons which buttress this rule. For one, it has long been recognized that a common carrier's liability as such ceases upon delivery of a shipment to the consignee. See Secretary of Agriculture v. United States, 347 U.S. 645, 647, 74 S. Ct. 826, 98 L.Ed. 1015 (1954); Republic Carloading and Distrib. Co. v. Missouri Pac. R. R., 302 F.2d 381 (8 Cir. 1962); 13 C.J.S. Carriers § 185 (1939). Additionally, it is generally considered that a consignee (in this instance the consignee and shipper are the same entity) is in a much better position to dispose of the damaged merchandise than the carrier who is not in the business of buying and selling the product involved. See Kennedy & Kratzer, Inc. v. Chicago, B. & Q. R.R., 245 N.E.2d 910 (Ill.App.1969). This is consonant with the fact that unless the goods are worth only "salvage value" at their point of delivery (cf. Atlantic Coast Line R. R. v. Tifton Produce Co., 179 Ga. 624, 176 S.E. 624, 96 A.L.R. 772 (1934)), the carrier could be at the mercy of low bidding on the product by a consignee or third parties. Under such circumstances there exists no justification to make a carrier a forced buyer by a forced contract. All of these principles stem from the common law recognition that every party must use every reasonable means to lessen the damage caused by another. Restatement of Contracts § 336(1); 11 Williston, Contracts § 1353 (3d ed. 1968); and 5 Corbin, Contracts § 1039 (1964).

■ The instant proceedings are governed by the Carmack Amendment which has merely codified the above common law principles governing the liability of a carrier to a shipper. 49 U.S.C.A. § 20(11). See Missouri Pac. R.R. v. Elmore & Stahl, 377 U.S. 134, 140 n. 12, 84 S.Ct. 1142 (1964). It is significant that the language of the statute limits the liability of the carrier to *"the full actual loss, damage * * * caused by it."* (Emphasis ours.) Where damage arises from the fault of the shipper or consignee the carrier has no liability under the express language of the statute. Cf. F. J. McCarty Co. v. Southern Pac. Co., 289 F.Supp. 875, 881 n. 32 (N.D.Cal.1968).

■ Within these principles, we review the present facts. The district court found that the corn was "of such depreciated quality" that the plaintiffs had a right to reject the whole shipment. The trial court based its conclusion on the finding that the shipments,

2. Cf. Schnell v. The Vallescura, 293 U.S. 296, 305–306, 55 S.Ct. 194, 70 L.Ed. 373 (1934).

undamaged having a gross value approximating $3,000 per car, being *"ultimately"* salvaged for less than $500 per car were "substantially worthless." Under the clearly erroneous rule we hold the finding that the corn, *when originally delivered to the consignees in Davenport*, was substantially worthless must be set aside. There exists no credible evidence to support this conclusion. The plaintiffs have the burden of proving not only fault of the carrier, which they have sustained, but also their actual damages. See Missouri Pac. R.R. v. Elmore & Stahl, supra. Under the circumstances, since plaintiffs premise their damages on the difference of the market value of the corn as shipped and the salvage value obtained by the carrier, some 15 days after rejection, they necessarily possess the burden of showing that the goods at the time of their rejection had no substantial value. We view the only evidence in the record to the contrary. Smith, the grain broker, testified that he considered the corn to be "unmarketable" or "unmerchantable"[3] to fulfill open contracts which he had with various customers. He based this conclusion upon a grading report phoned to him by the licensed grain inspector. However, whether the goods are unmarketable under Fraser-Smith contracts with its customers does not establish whether the goods are totally worthless. Moreover, Smith's advice to the shippers to reject the corn was not on the basis that the goods were totally worthless. Smith advised rejection because:

"* * * I thought the best way to handle the car, if he (the shipper) didn't want it applied, I would go and solicit the trade to try to make the best application possible and report to him the discount which I would take, but that would involve a more complicated alternative, and that I thought it was simpler to reject the car and turn it over to the railroad."

Upon rejection Smith as a broker planned to bid on the cars himself but the carrier never gave him the opportunity.[4]

One of the difficulties with Smith's appraisal of the corn is that his conclusion was based solely upon the hearsay report of the grade of the corn made by the licensed inspector. Cf. Gulf, Colorado & Santa Fe Ry. v. Hill, 284 S.W. 594 (Tex.Civ.App.1926). Smith himself did not see the corn or inspect it. In fact no witness was called who actually described from personal observation the condition of the corn upon its arrival in Davenport. The inspection report does not indicate that the corn was totally worthless. On the contrary, Mr. Johnson, owner and operator of the grain elevator at Montezuma, testified that the grading showed only "early stages of economic deterioration." Mr. Martin, the operator of the Traer elevator testified that there exists a market value for spoiled corn. He related that if one could find a ready and willing buyer, the

3. He defined "unmerchantable" to mean: "Other than having odor and heating and out of condition, DLQ, which means they contain pebbles or contain seed corn that has poisonous toxic residues on the kernel, and there are other types of unmerchantable products."

4. Smith later testified that he told the railroad freight claims manager over the telephone: "I would have loved to have bid on these cars. Why didn't you let me bid on them?" Assuming Smith, as a broker, would have purchased the corn from the railroad and then sold the corn to third parties for a profit other legal issues might arise. Would Smith, presumably acting in a different capacity, still be acting as a putative agent for the consignees? Would the railroad or the shippers-consignees have been entitled to credit to the loss any profit Smith might have turned? Obviously these questions need not be answered here. However, the possibility that someone representing the plaintiffs' interests could have turned an additional profit upon repurchase of the corn from the carrier points up the inequity of the plaintiffs' claim of total loss here.

net value of the corn discounted would not have been less than $1.00 per bushel cautioning that it might be difficult to find a buyer with the corn in this condition. He admitted that he did not attempt to find any buyer. Smith evidently did not tell him or Johnson he would have been interested in bidding on the corn. Martin's testimony revealed:

"Q. And, I think it is also true isn't it, Mr. Martin, that corn with a heating and sour factor on grade certificates is still valuable corn, isn't it? A. Yes, it has some value, yes.

"Q. And, isn't it true there is about in this time of year in 1966, corn with heating and sour factor such as the corn in these two cars which allegedly have given rise to a discount of about ten to twelve cents, I think? A. For the heating and sour factor, yes. There could have been some extra discount, I think there was eight percent damage on one car, there would be another cent and a half on that discount, for example it is one half percent for each percentage point over five."

In contrast to the condition of the corn at the time of its arrival in Davenport, when it was graded by the inspector, Johnson opined that after two to three weeks additional delay, when the corn was sold in Oskaloosa, it was then "in a high state of deterioration." We find that the evidence conclusively shows that the ultimate salvage price obtained by the railroad in Oskaloosa at least two weeks after its delivery to the consignee at Davenport did not represent the fair market value of the corn on the date that Fraser-Smith rejected the shipments in Davenport.

The trial court additionally reasoned that even if plaintiffs' rejection was wrongful, the railroad failed to exercise reasonable means to sell the shipments at a higher price immediately after the consignees' rejection. The court said the defendant easily could have avoided the result complained of "by accepting plaintiffs' offer to assist in the liquidation of the product and thus perhaps accomplish a minimization of damages." We are unaware of any rule that a carrier must attempt to mitigate the consignee's damage once the consignee has given notice to the carrier that it intends to abandon the shipment. When this occurs the carrier may have collateral duties to notify the consignor (see generally, 13 Am.Jur.2d Carriers § 433 (1964)), but in the instant case the consignor and the consignee in each shipment were the same party. When the shipper-consignee wrongfully abandons the goods it does so at its peril and the carrier is at liberty to sell the goods at whatever price it can obtain. *Miller's,* supra at 325–26; 1 Michie, A Treatise on the Law of Carriers, § 868 (1915). Cf. Kennedy & Kratzer, Inc. v. Chicago, B. & Q. R.R., 106 Ill.App.2d 278, 245 N. E.2d 910 (1969); Denver-Chicago Trucking Co. v. Republic Drug Co., 143 Colo. 461, 306 P.2d 1076 (Colo.1951); Cincinnati, N. O. & T. P. Ry. v. Rankin, 153 Ky. 730, 156 S.W. 400, 404 (1913). To impose upon the carrier the affirmative duty to further mitigate the damage where the shipper-consignee has abandoned the goods, would be to allow the consignee to totally circumvent its duty to mitigate the damage in every shipment by merely rejecting the shipment regardless of the damage to its contents. For all practical purposes the consignee by its abandonment has notified the carrier that it feels the goods are worthless and the carrier has no duty to assume otherwise. As has been authoritatively written, when the consignee abandons the goods to the carrier, the carrier "will be liable only to the same extent as if [the] consignee had accepted the goods and observed its legal duty." *Miller's,* supra at 325. To penalize the carrier for failing to accept the plaintiffs' assistance to mitigate the damage, overlooks the fact that the plaintiffs fully possessed the opportunity to mitigate the damage before abandonment, but refused to do so. It was the shippers' agent who wrongfully rejected the corn at Davenport, and as be-

tween the carrier and a shipper, the latter must suffer any resultant loss which flows from an abandonment.

This brings us to final disposition of the case. Once damage and fault has been shown under § 20(11) the carrier has the general burden of proving that the plaintiff could have reasonably mitigated his damages. See generally, 14 Am.Jur.2d Carriers § 632 (1964). We think the railroad's burden has been satisfied in the present case. The proper measure of damage controlling in the instant case is the difference between the market value of the undamaged goods as shipped (no dispute as to this) and the reasonable market value of the damaged product as delivered to the consignee (in Davenport). See Gulf, C. & S. F. Ry. v. Texas Packing Co., 244 U.S. 31, 37, 37 S.Ct. 487, 61 L.Ed. 970 (1917); Great Atl. & Pac. Tea Co. v. Atchison, T. & S. F. Ry., 333 F.2d 705, 708–709 (7 Cir. 1964), cert. denied 379 U.S. 967, 85 S.Ct. 661, 13 L.Ed.2d 560 (1965); Olsen v. Railway Exp. Agency, Inc., 295 F.2d 358 (10 Cir. 1961). See also Sunset Motor Lines, Inc. v. Lu-Tex Packing Co., 256 F.2d 495 (5 Cir. 1958); F. J. McCarty Co. v. Southern Pac. Co., 289 F.Supp. 875 (N.D.Cal.1968).

 The only evidence concerning market value at the time of the carrier's delivery to the consignee in Davenport is that reflected by Mr. Martin's testimony regarding discount prices of corn graded similar to these shipments. This discount would bring a net price for the corn in a range from $1.00 to $1.25 a bushel. On the facts presented, market value would be difficult to more accurately appraise. Plaintiffs' argument that there is no showing that any buyer would purchase the corn at that price range is not compelling here. First, Martin's testimony reveals that based on the inspector's grading and the time elapsed from date of shipment, the corn was only in early stages of deterioration. He acknowledged that corn which was heated and soured does have a market value; that the pricing index used usually discounts such produce value by

ten to twelve cents. A pricing index offers competent proof of fair market value. See Great Atl. & Pac. Tea Co. v. Atchison, T. & S. F. Ry., supra 333 F.2d at 708; Kennedy & Kratzer, Inc. v. Chicago, B. & Q. R.R., supra. Smith "would have loved" to bid on the corn, but his testimony does not disclose what he would have paid. Under the circumstances we feel the record does establish a range of discount values which would allow a trier of fact to ascertain the reasonable market value of the shipment at the time of its delivery to the consignee in Davenport.

We reverse and vacate the judgment; we remand for the trial court to determine from the evidence the reasonable market value of the goods as delivered to the consignee in Davenport. Upon such determination the court should enter a new judgment based upon the actual damages the plaintiffs have incurred.