

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-15-2001

# Beta Spawn Inc v. FFE Transp Ser Inc

Precedential or Non-Precedential:

Docket 00-1332

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Beta Spawn Inc v. FFE Transp Ser Inc" (2001). *2001 Decisions.* Paper 104.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/104

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 15, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1332

BETA SPAWN, INC.

v.

FFE TRANSPORTATION SERVICES, INC.,

Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA
(Dist. Court No. 99-CV-00815)
District Court Judge: William H. Yohn, Jr.

Argued on March 8, 2001

Before: ALITO, McKEE, and KRAVITCH,*
Circuit Judges.

(Opinion Filed: May 15, 2001)

      ROBERT C. HOUPT, ESQ.
       (ARGUED)
      Houpt & Wolffe, Ltd.
      45 Darby Road
      Paoli, PA 19301

Counsel for Appellee

_____
* The Honorable Phyllis A. Kravitch, Senior Judge, United States Court
of Appeals for the Eleventh Circuit, sitting by designation.

JACK L. COKE, JR., ESQ.
  (ARGUED)
Suite 800
8117 Preston Rd
Dallas, TX 75225

CHARLES L. HOWARD
Gollatz, Griffin, & Ewing, P.C.
16th Floor, Two Penn Center Plaza
Philadelphia, PA 19102

Counsel for Appellant

OPINION OF THE COURT

KRAVITCH, Circuit Judge:

FFE Transportation Services, Inc. ("FFE") appeals from the judgment of the district court finding FFE liable to Beta Spawn, Inc. for the value of a shipment of mushr oom spawn damaged during transport. FFE contends that the district court erred in finding (1) that Beta Spawn established a prima facie case under the Car mack Amendment to the Interstate Commerce Act, 49 U.S.C. S 11706; (2) that FFE's tariff was not applicable to the shipment at issue; and (3) that FFE had agreed to maintain the temperature of its trailer at 34 degr ees Fahrenheit[1] when transporting the spawn. Because we hold that the district court ruled correctly on all thr ee issues, we affirm the judgment of the district court in favor of Beta Spawn on its claim for damages and against FFE on its counter claim to recover freight charges.

I. Background

Beta Spawn, a Pennsylvania corporation, supplies mushroom spawn to the mushroom industry. [2] At all times

_____

1. All references to "degrees" herein are to the Fahrenheit scale.

2. "Spawn are the `fragments of mycelia used to start a mushroom culture.' " Beta Spawn v. FFE T ransp. Servs., Inc., No. 99-0815, 2000 WL 288332, at *1 (E.D. Pa. Mar. 17, 2000) (citation omitted).

2

relevant to this case, Beta Spawn has been the exclusive distributor of a variety of spawn from Italy known as Italspawn. FFE is a common carrier hired by Beta Spawn to transport a shipment of Italspawn from Camarillo, California to Beta Spawn's facility in Pennsylvania.

According to the district court's findings, mushroom spawn are "living, breathing" or ganisms that must be maintained at a temperature of approximately 36 degrees. Harry Testa, vice-president of Beta Spawn, testified that when spawn are exposed to higher temperatur es, they begin to generate their own heat and to ferment. Spawn that have begun to ferment are damaged and lose their viability. Once spawn are exposed to heat, attempts to re-cool the spawn will not be successful. Because spawn are fragile, they must breathe filtered air to avoid contamination. For that reason, spawn ar e packaged in clear, plastic bags with air filters on each bag. Condensation and yellow discoloration are signs of contaminated spawn. Damaged spawn also have a characteristic odor similar to that of vinegar .

In June 1997, Beta Spawn sold a truckload shipment of Italspawn (the "June Shipment") to Peterson's Ranch in Camarillo, California.3 Louis Peterson, an officer and director of Mushrooms, Etc. who received the shipment in California, testified that some of the boxes containing the spawn were torn and crushed at the time of arrival. Nevertheless, Peterson used spawn out of those damaged boxes to grow his first crop of mushr ooms.

In September 1997, Peterson agreed to sell 16,000 units of the Italspawn back to Beta Spawn. These spawn had been stored for three months in a facility that was nearby, but not on, the farm premises and, accor ding to Peterson, had remained refrigerated the entir e time. Peterson testified that about three weeks after the spawn wer e shipped to Beta Spawn, he used a remaining portion of the June Shipment to grow a successful crop of mushrooms. That portion, however, was not stored in the same facility as the spawn sold to Beta Spawn.

_____

3. Peterson's Ranch, also known by the name "Mushrooms, Etc.," is a mushroom farm.

On behalf of Beta Spawn, Testa contacted Michael Conn of FFE to arrange for the shipment of the spawn from California to Beta Spawn's facility in Pennsylvania. During their conversation, Testa and Conn verbally agreed that FFE would transport the spawn at a temperature of approximately 34 degrees. FFE had shipped spawn for Beta Spawn before and had always transported the spawn in a trailer maintained at 34 degrees.

On September 23, 1997, FFE entered into a bill of lading /contract of carriage with Mushrooms, Etc. of California for the transportation of the spawn to Pennsylvania. Mushrooms, Etc. requested that FFE provide it with less-than-truckload ("LTL"), "chilled" service. Beta Spawn, as consignee, agreed to pay FFE $2,685.36 for the shipment upon delivery. The bill of lading, prepared by Peterson Ranch, called for the transport of 16,000 units of spawn, packed in 400 boxes. The spawn were packed in clear plastic bags, three bags to a box, separated by cardboard dividers. Each cardboard box contained holes to permit air circulation. Peterson loaded the boxes into FFE's refrigerated trailer on 10 pallets, 40 boxes to a pallet. Initially, the boxes were only secured to the pallets with clear plastic tape, but after the pallets were loaded onto the truck, William Forbito, the driver for FFE, shrink-wrapped the boxes to prevent their falling over during transport.

Forbito testified that when he picked up the spawn, he asked Peterson at what temperature he was to maintain the shipment. After Peterson responded "it goes chilled," Forbito recorded the word "chill" on the bill of lading. Forbito also wrote the words "Temp. 34 degrees" on the bill of lading. At trial, Forbito explained that when he accepted the spawn in California, he took the temperature inside one of the boxes and found it to be 34 degrees.

Forbito also gave testimony regarding the condition of the boxes. He stated that the bottom "two layers" of boxes on every pallet "were bubbled out like they're getting ready to bust open. The boxes was [sic] torn, they were crushed. And boxes open." Forbito did not recall seeing any actual torn bags of spawn. After observing the damaged condition of the boxes, Forbito called his dispatcher and was told he could accept the load as long as he noted the damage on

4

the bill of lading. Forbito then took exception to the condition of the entire load by writing "400" on the bill of lading.

Peterson testified that before the boxes wer e loaded onto FFE's trailer, he opened one of the boxes and removed a bag of spawn for inspection. Peterson's inspection of that bag consisted of a visual examination of the spawn's coloring and a "sniff test" through the air filter on the bag for the odor of spawn fermentation. Based on these tests, Peterson determined that the spawn wer e in good condition because there was no yellowish tint and no odor . Peterson also looked through cracks of the torn boxes in order to see whether the bags in those boxes were ripped or open. Peterson testified that he saw no open bags.

Forbito set the temperature of the trailer at 34 degrees and transported the shipment of spawn to Cudahy, California, where he loaded it onto another trailer that was also set at 34 degrees. A different driver then carried the shipment from California to Chicago. When the driver arrived in Chicago, approximately 100 boxes wer e crushed, but the temperature of the product was 34 degrees. In Chicago, boxes were removed from the truck, placed in a warehouse and later reloaded onto another truck bound for Pennsylvania. When the boxes left Chicago, appr oximately 20 of the boxes had "leaking product exposed."

The shipment of spawn arrived at Beta Spawn's facility in Pennsylvania on September 29, 1997. Testa, who was present when it arrived, described the shipment as a "big mess." Specifically, he stated that "the bags were broke [sic] on quite a few boxes" and that "[t]her e were a distinct odor that the spawn had started to sour." T esta checked the temperature of the spawn in approximately 10 boxes and found it to be between 48 and 58 degrees, which meant the spawn were no longer viable. Thus, Testa refused to accept delivery and notified FFE of Beta Spawn's claim for damages.

Beta Spawn originally brought its claim against FFE for damage to its freight in the Court of Common Pleas of Delaware County, Pennsylvania. FFE removed the case to federal court and filed a counterclaim for its freight

5

charges. The district court held a bench trial and granted judgment in favor of Beta Spawn. This appeal followed.

II. Standard of Review

This court has plenary review over the district court's choice and interpretation of legal standar ds and its application of those standards to the facts of the case. See Louis W. Epstein Family P'ship v. Kmart Corp., 13 F.3d 762, 765-66 (3rd Cir. 1994); Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 750 (3rd Cir . 1994). We review the district court's findings of fact for clear error . See Country Floors, Inc. v. P'ship of Gepner and Ford, 930 F .2d 1056, 1062 (3rd Cir. 1991) (citing Fed. R. Civ. P. 52(a)).

III. Discussion

A. Beta Spawn's Prima Facie Case

To establish a prima facie case against a common carrier under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. S 11706,[4] a plaintiff must prove the following three elements: "(1) delivery of the goods to the initial carrier in good condition, (2) damage of the goods before delivery to their final destination, and (3) the amount of damages." Conair Corp. v. Old Dominion Fr eight Line, Inc., 22 F.3d 529, 531 (3rd Cir. 1994) (citation omitted); see also Missouri Pacific R.R. Co. v. Elmore & Stahl , 377 U.S. 134, 138 (1964). After a bench trial, the district court found that Beta Spawn succeeded in establishing each of these elements.

FFE's main argument on appeal is that ther e was no competent evidence for the trial court to find that the spawn were delivered to FFE in good condition.[5] Specifically, FFE contends that under the law of this

_____

4. The district court found that this action was controlled by the Carmack Amendment. The Carmack Amendment imposes liability on a common carrier for the actual loss or injury to goods in an interstate commerce shipment. See 49 U.S.C. S 11706.

5. FFE does not contest the district court'sfindings as to the last two elements.

6

circuit, a shipper must prove by "dir ect evidence" that the merchandise was in good condition when tender ed to the carrier if such merchandise was not visible or open to inspection at the time it was tendered. In support of its contention, FFE points to Blue Bird Food Prods. Co., v. Baltimore & Ohio R.R. Co., 474 F.2d 102 (3rd Cir. 1973) ("Blue Bird I") appeal after remand, 492 F.2d 1329 (3rd Cir. 1974) ("Blue Bird II"). W e believe that FFE's reliance on Blue Bird is misplaced.

Blue Bird I involved a shipper who r elied solely upon a bill of lading, which represented that the carrier had received the shipment in "apparent good order," in order to prove that the goods had been tendered in good condition. See Blue Bird I, 474 F.2d at 104. The district court found such proof insufficient to establish the condition of the goods because the goods were in a sealed trailer and therefore not open for inspection. Bluebird Food Prods. Co. v. Baltimore and Ohio R.R. Co., 329 F . Supp. 1116, 1118 (E.D. Pa. 1971), vacated 474 F.2d 102 (3rd Cir. 1973). The district court stated rather broadly, however , that "[w]here merchandise is sealed in a trailer, and the contents are not open and visible, the plaintiff must establish by direct evidence that the goods were delivered to the carrier in good order." Id. After initially r emanding the case for the district court to determine whether the trailer was indeed sealed, we affirmed the district court's finding that a bill of lading was insufficient to prove the condition of goods which had been in a sealed container. See Blue Bir d II, 492 F.2d at 1331. Nevertheless, because the shipper in Blue Bird exclusively relied on the bill of lading, this court never reached the issue of what type of evidence--in addition to a clean bill of lading--would establish that the merchandise had been delivered in good condition.6

Other courts, apparently focusing on the "direct evidence" requirement in the district court's opinion, have cited Blue

_____

6. We explicitly stated in Blue Bird II, "[t]he issue presented is whether the introduction of a bill of lading with the notation `Received . . . the property described below, in apparent good order . . .' is sufficient to establish the good condition of the lading at the time it was delivered by the shipper to the carrier." Blue Bir d II, 492 F.2d at 1331.

Bird for the proposition that where goods are not open and visible, a shipper may present only direct evidence, as opposed to circumstantial evidence, in order to establish the condition of its goods. See, e.g. , D.P. Apparel Corp. v. Roadway Express, Inc., 736 F.2d 1, 4 (1st Cir. 1984) ("In fact, where the contents of the shipment are not visible or open for inspection, additional direct and affirmative proof is necessary to show that the cloth was in good condition when delivered to Roadway") (citing, inter alia, Blue Bird I, 474 F.2d at 107-08); see also Ed Miniat, Inc. v. Baltimore and Ohio R.R. Co., 587 F.2d 1277, 1282 (D.C. Cir. 1978) ("Under section 20(11) [of the Carmack Amendment], the burden of establishing the condition of the beef when entrusted to the railroad clearly lies on the shipper and discharging this burden requires some direct evidence of this condition.") (citations omitted).

In our view, however, the holding in Blue Bird, and even the "must establish direct evidence" language in the district court's opinion, were simply directed at making shippers produce evidence, other than a clean bill of lading, to establish the condition of goods which were not open and visible for the carrier's inspection. Accordingly, we reject the view that Blue Bird renders all circumstantial evidence irrelevant where the goods are not open and visible.7  See Fine Foliage of Fla., Inc. v. Bowman Transp., Inc., 901 F.2d 1034, 1038 (11th Cir. 1990) ("We find no support for [the carrier's] assertion that a judge may not rely on circumstantial evidence to establish the original condition of goods when that evidence is substantial and reliable."). Although a bill of lading, by itself, is not sufficient to establish the condition of goods that were neither visible nor open to inspection, a shipper may rely on other reliable evidence--direct or circumstantial--which is "sufficient to establish by a preponderance of all the evidence the

_____

7. It is logical that courts would prohibit a shipper's reliance on a clean
bill of lading alone where goods are not open and visible, because the condition of such goods are unknown to the carrier. See Pillsbury v. Illinois Cent. Gulf R.R., 687 F.2d 241, 244 (8th Cir. 1982) ("Where goods are shipped under seal, the condition of the goods cannot be within the carrier's knowledge."). It does not necessarily follow, however, that reliance on all other circumstantial evidence should be disallowed.

8

condition of the goods upon delivery." Pillsbury Co., 687 F.2d at 244 (8th Cir. 1982). Thus, even assuming that the shipment in the present case was not open and visible,[8] the only difference between Beta Spawn's evidentiary burden here, as opposed to in a case where goods are open and visible, is that Beta Spawn cannot rely solely on the bill of lading to establish the spawn's condition.

Unlike the plaintiff in Blue Bird , Beta Spawn does not rely on the bill of lading as proof that it tendered the spawn to FFE in good condition. Instead, it mainly r elies upon the testimony of Peterson, an officer and director of Mushrooms, Etc. Peterson testified that he successfully used a portion of the remaining Italspawn fr om the original June Shipment three weeks after the 16,000 units of spawn were shipped to Pennsylvania. Although we r ecognize that Peterson's success is not conclusive proof as to the condition of the spawn at issue because the two portions of spawn were kept in separate facilities, it does carry some weight in that all the spawn were stored under similar conditions. Peterson testified that the spawn--both on and off the farm--were refrigerated for the entire summer and never removed from the coolers. Further more, the cooler in which the spawn at issue were stored had a backup

_____

8. The district court made no finding as to whether the shipment of spawn was open and visible. FFE asserts in its brief that the shipment was not open to inspection because the spawn wer e contained in closed boxes and because FFE's policy prohibited drivers from opening closed boxes. We do not agree that such evidence necessarily establishes that the spawn were not visible and open to inspection. In contrast to the goods in Blue Bird, the spawn here were not in a sealed trailer.See Blue Bird II, 492 F.2d at 1332-33. Although FFE's policy did not permit drivers to inspect the contents of closed boxes, there is no evidence that FFE was prohibited by Beta Spawn from per forming such inspection. The only evidence that FFE would have been hinder ed from opening the boxes is that the boxes had been secured to the pallets with tape wrapped around them. The boxes were not, however, shrink wrapped when delivered to Forbito. Furthermor e, Forbito, FFE's driver, testified that when the boxes were loaded onto the truck, some of the boxes' top lids were open such that he could see some of the bags of spawn. Nonetheless, because we hold that Blue Bir d does not prohibit Beta Spawn from relying on circumstantial evidence, we need not affirmatively decide whether or not the spawn were open and visible.

generator in case of power outage. Peterson visited the facilities where the spawn were stored every three to four days.

Peterson's assertion that he maintained the spawn at a proper temperature during the summer was corroborated to some degree by Forbito's testimony that when he received the spawn, the temperature inside the boxes was 34 degrees and by evidence that the temperature was at 34 degrees when the truck reached Chicago. As Testa testified, once spawn is exposed to heat, an attempt to re-cool the spawn will not be successful. Therefore, the fact that the boxes were at 34 degrees on the day they were tendered to FFE and on the day they reached Chicago tends to show that the spawn previously had been stored at the proper temperature and were in good condition when tendered to FFE.

In addition, Peterson personally examined one of the bags of spawn before it was loaded onto FFE's trailer. There was no "characteristic odor" of spawn fermentation nor did the bag have a yellowish tint which signifies damaged spawn. Peterson's testimony that the bag contained good product was direct evidence only as to the condition of the spawn in that particular bag, but was circumstantial evidence of the spawn's condition in the other bags, as the bags had all been stored and loaded together. FFE asserts that there was insufficient proof that the spawn were in good condition in light of the fact that Forbito took exception to all four hundred boxes on the bill of lading and testified that the bottom two layers of boxes on every pallet were crushed, torn or open. Peterson testified, however, that he looked through the cracks where the boxes were torn and did not see any ripped bags. In addition, Peterson testified that even if boxes were torn, it was still possible for the spawn to remain undamaged. In fact, when Peterson initially received the June Shipment from Beta Spawn, he successfully used spawn which had arrived in torn boxes to grow his first crop of mushrooms.

Thus, considering all the evidence presented to the district court, we hold that the court did not err in finding that Beta Spawn met its burden of proof that the spawn were delivered to FFE in good condition.

B. Applicability of FFE's Tariff

Once a plaintiff has established a prima facie case under the Carmack Amendment, the burden shifts to the carrier to prove that it was free from negligence and that the damage was caused solely by "(a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or natur e of the goods." Missouri Pacific R.R Co. v. Elmore & Stahl, 377 U.S. 134, 137 (1964) (citation and internal quotation marks omitted). The district court found that no such proof was offered at trial. FFE does not directly challenge thatfinding, but in an apparent attempt to rebut Beta Spawn's prima facie case and to recover its freight charges, argues that its tariff regulated the temperature at which the trailer was to be maintained. See City of New Orleans v. S. Scrap Material Co., 491 F. Supp. 46, 48 (E.D. La. 1980) ("A tariff confers rights and imposes duties as a matter of law. Carriers, shippers, and consignees are bound by the pr ovisions of a tariff duly filed by the carrier.") (citations omitted).

According to the record, FFE publishes a tariff that sets regulations for, inter alia, goods that are shipped with protective services. Section C of the tarif f provides that an LTL shipment, shipped "cooler and so stated on the Bill of Lading by the shipper," must be maintained at an air temperature of between 35 and 60 degrees. The temperature inside the boxes of spawn when they reached Pennsylvania was between 48 and 58 degrees. Thus, FFE argued at trial that it provided the r equisite services in that the spawn arrived at a temperature that fell within the range prescribed by the tariff. The district court rejected this argument on the ground that FFE's tariff did not apply to the shipment.

On appeal, FFE maintains that the inclusion of the word "chill" on the bill of lading meant that the parties agreed that the tariff provision regulating the transportation of LTL shipments of "cooler" commodities applied to the shipment of spawn. Yet, it is undisputed that the wor d "chill" is not found anywhere in FFE's tariff. FFE asserts that the word "chill" is synonymous with "cooler" because FFE's Claims Director, Raymond Flemming testified that to him, the word "chill" meant the same as "cooler." Although Flemming's

11

testimony may prove that Flemming understood the word "chill" to signify "cooler," it does not necessarily establish Peterson's understanding of the word. Accordingly, we hold that the district court did not err by finding that FFE's tariff was not applicable to the shipment in this case.

C. Agreement to Maintain Temperature at 34 Degrees

FFE also argues that it was clearly erroneous for the district court to find that FFE had agreed to maintain its trailer at 34 degrees while transporting Beta Spawn's goods. The district court found that such agreement existed based on (1) prior business dealings between FFE and Beta Spawn involving the transport of spawn; (2) a "verbal agreement" between FFE and Beta Spawn that FFE would transport the spawn at 34 degrees; (3) the presence of the words "chill" and "34 degrees" noted on the bill of lading by Forbito; and (4) the temperature of FFE's trailer when it arrived in Chicago. FFE objects to this reliance on extrinsic evidence by the district court because the bill of lading, as prepared by Peterson, did not contain an agreement to maintain the trailer at 34 degrees.

Under Pennsylvania law, "[w]here the contract or agreement is unambiguous, parole evidence of prior inconsistent terms or negotiations is inadmissible to demonstrate intent of the parties." Harley-Davidson, Inc. v. Morris, 19 F.3d 142, 148 (3rd Cir. 1994); see also Gianni v. Russell & Co., Inc., 126 A 791, 792 (Pa. 1924). [9] Likewise, in its role as contract of carriage, the terms and provisions of a bill of lading cannot be varied by extrinsic evidence, and all negotiations leading up to the written agreement are presumed to be merged therein. See Internatio, Inc. v. M/V Yinka Folawiyo, 480 F. Supp. 1244, 1252 (E.D. Pa. 1979); see also EF Operating Corp. v. American Bldgs, 993 F.2d 1046, 1050 (3rd. Cir. 1993) ("As a contract, [a bill of lading] is subject to general rules of construction under contract law.") (citations omitted). Where a contract provision is ambiguous, however, extrinsic evidence may be properly admitted in an attempt to resolve the ambiguity. In re Herr's Estate, 161 A.2d 32, 34 (Pa. 1982).

_____

9. As the parties do not dispute that Pennsylvania law governs the interpretation of the agreement, we will apply Pennsylvania law.

A contract is ambiguous if "it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expr ession or has a double meaning." State Highway and Bridge Auth. v. EJ Albrecht Co., 430 A.2d 328, 230 (Pa. Commw. Ct. 1981) (citation omitted). Upon examination of the bill of lading, we conclude that the words "chill" and "T emp. 34 degrees" written by Forbito render the agreement ambiguous.10 To begin with, the word "chill" gives no indication as to the exact temperature intended by the parties, and there is no explanation of its meaning on the bill of lading. The lack of clarity surrounding the word "chill" is demonstrated by the parties' differing interpretations of the word. FFE asserts that "chill" meant that the parties intended that the shipment be kept at the temperature requir ed under its tariff for "cooler" commodities. Y et Forbito testified that when he wrote down "chill" after asking Peterson for the proper temperature to ship the spawn, he believed "chill" meant "34 to 37 degrees." Likewise, it is unclear whether "Temp. 34 degrees" indicates the temperature inside the boxes at the time they were tendered to FFE or the

_____

10. FFE argues that we should not look to the words "chill" and "Temp. 34 degrees" on the bill of lading because, as an independent contractor, Forbito had no authority to enter into agreements to bind FFE. The record reflects, however, that Forbito drove exclusively for FFE, was given authority by FFE to transport the shipment of spawn, specifically asked Peterson at what temperature the spawn was to be shipped, and was the only representative of FFE to sign the bill of lading. Thus, even assuming Forbito had no actual authority to add ter ms to the bill of lading regarding the proper temperature of the shipment, we believe there is sufficient evidence that he had apparent authority to do so. See Leidigh v. Reading Plaza Gen'l, Inc., 636 A.2d 666, 667–68 (Pa. Super. Ct. 1994) ("[T]his court has found apparent authority to be established with a showing of (1) limited authority given to the agent by the principal; and (2) conduct of the agent which demonstrates to the third–party the agent's apparent authority to bind the principal."). FFE apparently recognizes such authority on the part of Forbito because it argues in its brief that we should rely on the word"chill," written by Forbito, as evidence that the parties intended for FFE's tarif f to apply.

13

11. Forbito testified that he took the temperature of some of the boxes at the time they were loaded onto his truck in California and found it to be 34 degrees. But, when asked on cross-examination, "And when you write on here, chill, temperature 34, that's to keep the product at 34 degrees?," Forbito replied, "At 34 degrees, right." temperature at which FFE agreed to transport the spawn. Forbito's testimony supports both interpretations.11

Because we perceive ambiguity in the wor ds "chill" and "Temp. 34 degrees," we conclude that the district court properly considered extrinsic evidence in determining the existence of an agreement to maintain the trailer at 34 degrees. Accordingly, we agree with its findings that FFE did not provide the requisite services under the agreement and that FFE is not entitled to recover shipping charges.

IV. Conclusion

Based on the foregoing reasons, we affir m the judgment of the district court in favor of Beta Spawn on its claim for damages and against FFE on its counterclaim to recover freight charges.

AFFIRMED.

A True Copy:
Teste:

     Clerk of the United States Court of Appeals
     for the Third Circuit

14