**THE PAPER MAGIC GROUP, INC.**

v.

**J.B. HUNT TRANSPORT, INC., Appellant**

No. 01–3500.

United States Court of Appeals, Third Circuit.

Jan. 16, 2003.

James A. Wescoe, (Argued), Timothy J. Abeel, Rawle & Henderson LLP, Philadelphia, for Appellant.

Charles L. Howard, Gollatz, Griffin & Ewing, Philadelphia, George Carl Pezold, Raymond A. Sevaggio, (Argued), Augello, Pezold & Hirschmann, P.C., Huntington, for Appellee.

Before BECKER, Chief Judge, ALITO and AMBRO, Circuit Judges.

## OPINION OF THE COURT

AMBRO, Circuit Judge.

This case involves an award of damages against a carrier caused by a four-month delay in its delivery of a shipment of seasonal goods. The District Court awarded the shipper the entire invoice value for damages. The carrier appeals, arguing that the award constituted impermissible special damages. Because the award represents actual (or general) damages, we affirm.

## I. Background

The Paper Magic Group, Inc. ("Paper Magic"), a maker of greeting cards and seasonal paper goods, delivered a shipment of boxed Christmas cards and related holiday merchandise, specially developed and packaged for Paper Magic's customer, Target Stores, Inc. ("Target"), to J.B. Hunt Transport, Inc. ("Hunt") on October 16, 1998. Hunt was to transport the goods from Danville, Pennsylvania, to Target in Oconomowoc, Wisconsin. The shipment's invoice value was $130,080.48. Shipments of this nature are usually delivered within two to three days, but the bill of lading did not specify a delivery time or indicate that the goods were time-sensitive in nature.

This shipment got lost in the shuffle. Hunt located it on February 5, 1999, almost four months after it received the goods, at its facility in Chicago, Illinois. It then notified Paper Magic, which had been unaware of the delay because Target was not scheduled to pay for the goods until March 1999. Hunt offered to deliver the goods first to Target, and then to Paper Magic, but both refused–the goods were worthless to Target because it was now after Christmas, and worthless to Paper Magic because the cards were packaged with Target's private label and could not therefore be sold to other vendors.

Paper Magic was a regular Hunt customer, and their relationship was governed by a 1995 transportation agreement. This agreement set out Hunt's liability, in the case of a shipment being "lost, damaged, or destroyed," as "the price charged by Shipper to its customers" with reasonable salvage value of any damaged goods deducted from the price paid. This presumes that the shipper, rather than the carrier, sold the goods for their salvage value, a presumption that, as noted below, did not occur.

On April 26, 1999, Paper Magic demanded the full invoice price from Hunt for the lost shipment. In June of that year, Hunt sold the goods at salvage for $49,645.96. It offered this amount "as a full and final settlement" of Paper Magic's claim. Paper Magic rejected the offer, and filed an action against Hunt under 49 U.S.C. § 14706, the Carmack Amendment to the Interstate Commerce Act, seeking the full contract price in damages. Both parties moved for summary judgment. The District Court granted Paper Magic's motion, awarding $130,080.48 plus interest, and denied Hunt's cross-motion. Hunt appeal-

ed.[1]

## II. Discussion

 The Carmack Amendment governs the liability of common carriers on bills of lading. A bill of lading is a transportation contract between a shipper/consignor (*i.e.*, a seller of goods) and a carrier. *EF Operating Corp. v. American Bldgs.*, 993 F.2d 1046, 1050 (3d Cir.1993). The person named in the bill of lading as the person "to whom or to whose order the bill promises delivery" is the consignee. U.C.C. § 7–102 (2002). To establish a *prima facie* case against a carrier under the Carmack Amendment, a shipper must prove "(1) delivery of goods to the initial carrier in good condition, (2) damage of the goods before delivery to their final destination, and (3) amount of the damages." *Beta Spawn, Inc. v. FFE Trans. Serv., Inc.*, 250 F.3d 218, 223 (3d Cir.2001) (citation omitted). The burden then shifts to the carrier to prove it was not negligent and the damage was caused entirely by "[an] act of God[,] . . . the public enemy[,] . . . the act of the shipper [itself,] . . . public authority[,] . . . or the inherent vice or nature of the goods." *Id.* at 226.

 Under the Carmack Agreement, the measure of damages in the event that goods are damaged or delivery is delayed is "the difference between the market value of goods at the time of delivery, and the time when they should have been delivered." *Starmakers Publ'g Corp. v. Acme Fast Freight, Inc.*, 615 F.Supp. 787, 791 (S.D.N.Y.1985) (*Starmakers I*). This measure of damages is reflected in the transportation agreement between Paper Magic and Hunt, which, as noted above, describes the measure of damages as the invoice price minus the salvage price. Because the invoice value conforms to the market value of the cards at the time they should have been delivered, and the salvage value conforms to the market value of the cards at the time they were delivered, the two measures of damages produce the same results.

There is no question as to the first element of Paper Magic's claim. The goods were delivered in good condition. As for the second element, Hunt does not appeal the District Court's finding that the delay made the goods' value equivalent to nothing beyond their salvage value and that they were so diminished in value by the four-month delay that the late delivery was "in effect a non-delivery."

 The only issue on appeal is the District Court's calculation of damages. Hunt alleges that by awarding Paper Magic the full invoice amount of $130,080.48, the District Court awarded special, instead of general, damages. General damages are those "foreseeable to a reasonable [person]." *Hector Martinez & Co. v. Southern Pac. Transp. Co.*, 606 F.2d 106, 109 (5th Cir.1979). Special damages are "those that a carrier did not have a reason to foresee as ordinary, natural consequences of a breach when the contract was made." *Contempo Metal Furniture Co. v. East Tx. Motor Freight Lines, Inc.*, 661 F.2d 761, 765 (9th Cir.1981). The common law rule is that "special, or consequential, damages are not usually recoverable in an action for breach of contract." *Id.; see also Main Road Bakery, Inc. v. Consol.*

---

1. 49 U.S.C. § 14706 and 28 U.S.C. § 1337(a) gave the District Court jurisdiction, because the action arises under a federal statute regulating commerce, and the matter in controversy exceeds $10,000. We have appellate jurisdiction over the District Court's final or-der pursuant to 28 U.S.C. § 1291, and exercise plenary review over the District Court's grant of summary judgment. *Tse v. Ventana Medical Sys. Inc.*, 297 F.3d 210, 217–18 (3d Cir.2002).

*Freightways, Inc.,* 799 F.Supp. 26, 28 (D.N.J.1992). The Carmack Amendment did not alter that rule; courts award special damages only where a shipper actually notified the carrier that the goods required special handling of some kind, thereby giving the carrier notice and making the damages foreseeable. *Id.*

The distinction between "special" and "general" damages has a distinguished lineage in the common law, including chestnuts such as that favorite of first-year law casebooks –*Hadley v. Baxendale,* Ex. 341, 156 Eng. Rep. 145, 5 Eng. Rul. Cas 502 (1854). In *Hadley,* the business of a mill ground to a halt when the crankshaft of the steam engine broke. The carriers caused a delay in shipping the new crankshaft, and the mill owners sued for lost profits. Because the mill owners had not informed the carriers of how crucial the crankshaft was to their business, the lost profits were not foreseeable, and the mill owners could not recover special damages.

Recent cases analyzing the distinction are *Main Road Bakery, Inc.,* 799 F.Supp. at 26; *Starmakers Publ'g Corp. v. Acme Fast Freight, Inc.,* 646 F.Supp. 780 (S.D.N.Y.1986) (*Starmakers II* ); and *Starmakers I,* 615 F.Supp. at 787. In *Main Road Bakery, Inc.,* a new bake oven was damaged in transit, and the shipper bakery was without a functional oven for several days. 799 F.Supp. at 27. The Court rejected as impermissible special damages its claim of lost profits as a result of being without a functional oven. *Id.* at 28. The Court dismissed in *Starmakers II* the claim that a "later delivery resulted in a total loss of value." 646 F.Supp. at 782. In *Starmakers I,* the Court dismissed a claim for lost business stemming from the delivery of movie posters five weeks late (and after the release of the movie that was their subject) as special damages. 615 F.Supp. at 791.

Paper Magic is not seeking special damages. It is not seeking recovery for its loss of use, its lost future profits, or its additional labor. Instead, it is seeking actual damages: the loss in value of the shipment due to Hunt's delay. We do not think that the District Court erred in concluding that Hunt can be charged with foreseeing that a four month delay would cause harm to Paper Magic. A carrier has reason to believe that a delay of four months will substantially diminish a shipment's value, particularly when the shipper, with whom the carrier has an ongoing business relationship, is in the business of producing seasonal paper goods.

Hunt argues that Paper Magic should have sued for "the difference between the full price and the market value of the shipment on the date of actual tender." Appellant's Br. at 13. Instead, Paper Magic claimed the entire invoice price. Hunt reasons that this amounts to a claim for special damages because it is, in essence, a claim for loss of market value due to delay. Hunt is mistaken. The transportation agreement required that Hunt pay Paper Magic the invoice price, less "reasonable salvage value." Hunt was able to sell the goods at salvage, for $49,645.96, and kept that amount. Therefore, its payment of $130,080.48 resulted in a net loss to it of $80,434.52. This difference is precisely what the transportation agreement provides–the invoice price less salvage value. Hence, these are not special damages, but general damages, *i.e.,* the difference between the invoice price and the best evidence of the value on the date of delivery.

As in any other action for contract damages, a buyer/consignee is ordinarily under a duty to accept the shipment from the carrier, and a shipper/consignor is ordinarily under a duty to mitigate its loss. *See Fraser–Smith Co. v. Chicago,*

*Rock Island & Pacific R.R. Co.*, 435 F.2d 1396, 1399 (8th Cir.1971) ("The law is well settled that where goods are shipped by common carrier and become damaged in transit, the consignee nevertheless has the duty to accept the shipment."); *M. Golodetz Export Corp. v. S/S Lake Anja*, 751 F.2d 1103, 1112 (2d Cir.1985)("A shipper is under a duty to mitigate his losses."). However, neither duty applies when the goods are deemed worthless, which is understood as occurring when the goods are "worthless for their intended purpose" or "worth only their salvage value." *Oak Hall Cap and Gown Co. v. Old Dominion Freight Line*, 899 F.2d 291, 294–95 (4th Cir.1990) (citing *Fraser–Smith Co.*, 435 F.2d at 1399).

In this case, the District Court's finding was that the cards were worthless to Target and to Paper Magic because they were 1998 Christmas cards, specially packaged for Target, that were found by Hunt in February of 1999. *Paper Magic Inc. v. J.B. Hunt Transport, Inc.*, 2001 WL 1003052, at *2 (E.D.Pa. Aug.29, 2001).[2]

The duty to accept and mitigate is "predicated upon very practical consider-ations," namely the fact that a buyer/consignee (or, conversely, a seller/shipper/consignor) "will often be a dealer or trader in the type of goods involved and thus may be in a much better position to dispose of those damaged goods than the carrier who is not in the business of buying and selling the type of goods involved." *Long Prarie Packing Co. v. Midwest Emery Freight System, Inc.*, 429 F.Supp. 201, 203 (D.Mass.1977) (citing *Fraser–Smith Co.*, 435 F.2d at 1399). But when the goods can only be sold at salvage, the carrier is likely as well-equipped to make such a sale as the seller or buyer because no special knowledge of the product or of likely secondary markets is required to dispose of the goods as profitably as possible.

Moreover, Hunt does not argue that Paper Magic should have accepted the shipment and mitigated its damages. Hunt did not argue in the District Court, and has pointed to no evidence, that Paper Magic could have obtained a higher value for the goods than did Hunt. Thus, we will not lessen Paper Magic's award for failure to accept the shipment.[3]

---

**2.** As pointed out in note 3 below, Judge Becker would dispute this conclusion.

**3.** Judge Becker joins in the opinion of the Court on the following understanding. He acknowledges that the case was presented on appeal as a general/special damages controversy, and that the opinion of the Court properly disposes of that issue. He makes the following observations in order to set forth his understanding of the relative obligations of shippers, carriers, and consignees under the Carmack Amendment, which he believes are not fairly reflected by the result in this case (or the Court's opinion) because the carrier failed to make the correct argument.

The transportation agreement between Paper Magic and Hunt provided that:

[I]f a shipment or any part thereof is lost, damaged or destroyed, [Hunt] shall pay to [Paper Magic] the price charged by [Paper Magic] to its customers for the kind and quantity of commodities lost, damaged or destroyed [,] . . . *but [Paper Magic] shall deduct from such invoice to [Hunt] the reasonable salvage value of any damaged commodities.*

[A 179] (emphasis added).

The opinion of the Court acknowledges that this contract "presumes that the shipper, rather than the carrier, sold the goods for their salvage value, a presumption that . . . did not occur." The presumed event did not occur because the shipper, Paper Magic, refused to accept the cards and sell them for salvage after Target rejected the shipment. Hunt, the carrier, thus became stuck with the cards, and it was able to sell them at a salvage value of $49,645.96. The opinion concludes from this merely that the salvage value wound up in the wrong hands – the transportation agreement assumed that Paper Magic would sell the cards, retain their salvage value, and recover the difference from Hunt, yielding an

"expectation" recovery which in this case would be $130,080.48. Instead, the opinion reasons, Hunt "retained" the salvage value, so it should have to return it to Paper Magic along with the $80,434.52 net loss.

Judge Becker believes this result to be incorrect because the transportation agreement's "presumption" that Paper Magic would sell the cards for salvage value in fact subsumed Paper Magic's *duty* to sell them. Following Target's rejection, the cards remained Paper Magic's property. Target had the right to refuse them since they were useless for their intended purpose, *i.e.*, to sell in the 1998 holiday season, but its decision to exercise that right did not somehow vest ownership of the cards in Hunt. Paper Magic's refusal to accept them back therefore amounted to an abandonment of its property. Its abandonment, however, did not alter the terms of its agreement with Hunt, which was still liable to Paper Magic only for the amount of Paper Magic's net loss, *i.e.*, $80,434.52. Under this result, Hunt would effectively lose only $30,788.56 ($80,434.52 minus the $49,645.96 it received when *it* sold the cards at salvage price).

Judge Becker notes that awarding Paper Magic $130,080.48 would implicitly sanction Paper Magic's decision to foist upon Hunt its duty to sell the cards for their salvage value. Not only is that result contrary to the transportation agreement itself, it is undesirable from an efficiency standpoint. In *Fraser–Smith Co. v. Chicago, Rock Island & Pacific Railroad Co.*, 435 F.2d 1396 (8th Cir.1971), the Court noted that "it is generally considered that a consignee ... is in a much better position to dispose of the damaged merchandise than the carrier who is not in the business of buying and selling the product involved." *Id.* at 1399. The same logic applies here. Paper Magic, whose business it is to manufacture and distribute greeting cards, would be in a far better position than Hunt to find another buyer for them. It is therefore likely that Paper Magic could obtain a better price – it is unrealistic that unused Christmas cards, even ones that are a year out of date and that are therefore "worthless for their intended purpose," are worth no more than the paper upon which they are printed. There is no evidence that the cards were suitable for sale only in 1998, and there is always a next Christmas. By forcing Hunt to sell the cards, Paper Magic exposed it to two costs the contract itself did not contemplate: the cost of actually selling the goods as salvage, which Hunt expected Paper Magic to bear, and the "lack of expertise" cost, which is created because the salvage price Hunt obtained is likely lower than the price Paper Magic could have obtained. Under the transportation agreement, of course, Hunt is liable to Paper Magic for the expected sales price of $130,080.48, less the salvage price, so the lower the salvage price, the higher Hunt's payout.

Judge Becker concludes that under the contract Paper Magic was entitled to two distinct means of compensation: it retained ownership of the damaged goods themselves, which had some salvage value, and it could seek compensation from Hunt for its net loss. By refusing to take back its cards, which were its property and which it could sell at least for salvage value, Paper Magic abandoned part of its compensation; Hunt did not decide simply to "retain" that compensation. Paper Magic's decision to abandon its property could not logically affect the sum of money that Hunt owes to Paper Magic, as that sum properly reflects *only* the amount by which the cards depreciated.

Judge Becker does not advocate this result here in view of Hunt's failure to advance it. However, he makes these observations in order to set forth his understanding of the relative obligations of shippers, carriers, and consignees under the Carmack Amendment.

Judges Ambro and Alito do not believe that the language of the transportation agreement creates any such duty; rather, it merely codifies the appropriate measure of damages under the Carmack Agreement and is, as are all measures of damages under contract law, designed to put the injured party back in as good a position as it was before the contract was breached. *See Mitsubishi Shoji Kaisha v. Davis*, 291 F. 882, 885 (S.D.N.Y.1922) (Hand, J.) (reasoning that underlying consideration in calculating damages for shipper against carrier is "the reasonable consequences of the wrong done"). Given this purpose, the general rule is that when goods are lost or destroyed the shipper is entitled to damages in the form of the payment of the entire invoice price. *See Robert Burton Assoc., Inc. v. Preston Trucking Co., Inc.*, 149 F.3d 218, 221 (3d Cir.1998) ("[O]rdinarily when the carrier is responsible for the loss of the goods in transit, the shipper is entitled to recover the contract price from the carrier."). In this case, as the District Court noted, the late delivery of the goods was, in essence, a nondelivery. *Paper Magic Group, Inc.*, 2001 WL 1003052, at *2. Of course, when goods are damaged, returned

The District Court's award left both parties in their rightful place. If Paper Magic had conducted a salvage sale, it presumably would have obtained $49,645.96, and sued Hunt for the remaining $80,434.52, netting the full invoice amount of $130,080.48. Instead, Hunt retained the $49,645.96 salvage value, and paid Paper Magic $130,080.48. The bottom line remains the same: Hunt's net loss is $80,434.52, and Paper Magic receives $130,080.48 (plus interest). Changing the salvager's identity does not somehow transmute general into special damages.

\* \* \* \* \* \*

Because Hunt retained the benefit of the salvage value of the goods, we conclude that the District Court awarded Paper Magic general, and not special, damages. We therefore affirm.

---

to the shipper, and the shipper sells them for salvage, then payment of the entire invoice price would result in a windfall to the shipper. *See Novelty Textile Mills, Inc. v. C.T. Eastern, Inc.*, 743 F.Supp. 212, 220–21 (S.D.N.Y.1990). This we do not permit.

Using the same principle of fairness, allowing Hunt to retain the salvage value of the cards because Paper Magic did not attempt to mitigate its damages essentially double counts the reduction of the salvage value by both subtracting the salvage value to prevent a windfall to Paper Magic, and then subtracting the same value again as punishment for Paper Magic's failure to mitigate. Subtraction of the salvage value of the cards is not an appropriate way to penalize Paper Magic for its failure to mitigate. *Corbin on Contracts*, § 1039 at 242 (interim ed.2002), explains that the duty to mitigate is a misnomer because "there is no judicial penalty for [the injured party's] failure to make this effort. His recovery against the defendant will be exactly the same whether he makes the effort and mitigates his loss, or not." Judges Ambro and Alito do not find that the language of the transportation agreement indicates an intent to provide for such a penalty. Hunt is not entitled to pay *less* than the damages it caused (here measured by the invoice price minus the salvage value, or $130,080.48—$49,645.96) because of Paper Magic's failure to mitigate its damages.

Judge Becker also argues that by refusing to accept the delivery, Paper Magic has, in essence, abandoned its property. Just because Hunt is the one who sold the goods, not Paper Magic, does not mean that Paper Magic forfeits its right to ownership of the goods and, therefore, to the proceeds of the resulting sale. The situation here is analogous to the situation where a buyer rightfully rejects damaged goods, and notifies the seller, but the seller fails to give the buyer reasonable instructions about what to do with the goods. Under U.C.C. § 2–604, the buyer has three illustrative options: it "may store the rejected goods for the seller's account or reship them to him or resell them for the seller's account." As the Comment to this provision makes clear, this is essentially a salvage operation. U.C.C. § 2–604 cmt.; *see also* 3A Duesenberg *et al., Sales & Bulk Transfers under the Uniform Commercial Code*, § 14.02[1][c][i], at 14–25 (2002). These options transpose well to the carrier–Hunt. It resold the goods for Paper Magic's account, not its own. If Hunt nonetheless keeps the salvage proceeds, the equivalent of those proceeds belong to Paper Magic as part of its damages.