**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 17-3121

MECCA & SONS TRUCKING CORP.

v.

WHITE ARROW, LLC; ABC CORPORATIONS 1-5,
(said names being fictitious); JOH DOES 1-6,
(said names being fictitious);
TRADER JOE'S COMPANY, INC.

White Arrow, LLC,

Appellant

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 2-14-cv-07915)
District Judge: Honorable Stanley R. Chesler

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
July 13, 2018

Before: McKEE, VANASKIE[*] and RESTREPO, *Circuit Judges*.

(Filed:  March 25, 2019)

---

[*] The Honorable Thomas I. Vanaskie retired from the Court on January 1, 2019 after the argument and conference in this case, but before the filing of the opinion.  This opinion is filed by a quorum of the panel pursuant to 28 U.S.C. § 46(d) and Third Circuit I.O.P. Chapter 12.

---

OPINION**

---

RESTREPO, *Circuit Judge.*

Before us is a dispute over a rejected shipment of cheese. Trader Joe's, a national grocery chain, rejected a shipment of its private-label cheese based on high temperature readings during transit. The cheese was then destroyed due to safety concerns. The parties now dispute which should ultimately bear the cost of this loss. Because we agree with the District Court's judgment in this case, we will affirm.

**I**

As we write principally for the parties, we recite only the facts necessary for our discussion. Trader Joe's ordered a shipment of its private-label cheese from dairy manufacturer Singletons Dairy. This shipment was governed by a Master Vendor Agreement between the two parties, which required refrigerated products to "be shipped and received at 40°F or less" and to be monitored by a temperature monitoring device during transit. J.A. 384. Singletons retained Mecca & Sons Trucking Corp. to handle the shipment. Mecca, in turn, retained White Arrow to carry the shipment from Bayonne, New Jersey, to Fontana, California, with the email instruction that it be "chilled 40 degrees." J.A. 491.

The shipment, comprising seventeen pallets of cheese, was loaded into the

---

** This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

refrigerated truck, or "reefer," in good condition. However, when it arrived in Fontana, the temperature monitoring devices on some pallets evidenced reefer temperatures above forty degrees for prolonged periods during transit, including some readings above sixty degrees. Based on these readings, Trader Joe's representatives rejected part of the shipment "due to warm temp." J.A. 351, 353, 355. Mecca arranged for the rejected cheese to be transported to a cold storage facility, where it was tested by White Arrow's expert and eventually destroyed. Mecca then paid Singletons damages in the amount of $73,581.16, the value of the lost shipment. Mecca now seeks from White Arrow that amount plus $7,600.00 in additional costs under the Carmack Amendment, 49 U.S.C. § 14706. White Arrow denies Mecca's claim and maintains a cross-claim against Trader Joe's for wrongful rejection of cheese.

After a series of procedural back-and-forths, the District Court ultimately granted summary judgment in favor of Trader Joe's on White Arrow's wrongful rejection claim; granted summary judgment in favor of Mecca on its Carmack Amendment claim and damages; and granted summary judgment in favor of White Arrow on Mecca's claims of negligence and indemnification as preempted by the Carmack Amendment. White Arrow now appeals the District Court's grant of summary judgment in favor of Mecca and Trader Joe's.

**II**

The District Court had jurisdiction pursuant to 28 U.S.C. § 1337. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over the District Court's grant of summary judgment. *DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 75 (3d

3

Cir. 2018). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III

*A. Mecca's Standing to Bring a Carmack Amendment Claim*

As a threshold matter, we first address White Arrow's argument that Mecca, a broker, lacks standing to recover its losses under the Carmack Amendment. While White Arrow is correct in noting that the Carmack Amendment does not grant brokers a right to sue, Mecca may still avail itself of the provision granting a right of action to a "person entitled to recover under the receipt or bill of lading." 49 U.S.C. § 14706(a)(1). White Arrow has failed to demonstrate that Mecca is not a person entitled to recover its losses under this provision. [1] Further, as the District Court noted, Mecca's claim reasonably could be considered under a theory of equitable subrogation or as an action for apportionment under 49 U.S.C. § 14706(b), and White Arrow has made no attempt to rebut either of these findings. Therefore, absent a persuasive argument to the contrary, we

---

[1] White Arrow relies heavily on the Sixth Circuit's decision in *Exel, Inc. v. Southern Refrigerated Transport, Inc.*, 807 F.3d 140 (6th Cir. 2015), which rejected a broker's attempt to recover losses from a carrier under the Carmack Amendment. However, that case is easily distinguished from the issue before us, as the broker in that case sought to recover two types of losses not represented here. First, the broker had not reimbursed the shipper for its losses; it was only attempting to recover from the carrier on the shipper's behalf. Second, the broker was also seeking its own recovery for the carrier's alleged violation of their separate transportation agreement. Mecca does not fit either of these scenarios—instead, it is standing in Singletons' shoes after suffering Singletons' loss.

determine that Mecca has standing to assert a claim under the Carmack Amendment.[2]

*B. Mecca's Prima Facie Case*

We now turn to the question of whether Mecca was properly granted summary judgment against White Arrow on its Carmack Amendment claim. To recover under the Carmack Amendment, a plaintiff must first establish a prima facie case by proving the following three elements: "(1) delivery of the goods to the initial carrier in good condition, (2) damage of the goods before delivery to their final destination, and (3) the amount of damages." *Paper Magic Grp., Inc. v. J.B. Hunt Transp., Inc.*, 318 F.3d 458, 461 (3d Cir. 2003) (internal citation omitted). The first element is not contested here. The second element—whether the goods were damaged before delivery—presents the critical question in this case.

To establish the damaged condition of the goods upon delivery, a plaintiff must present direct or circumstantial evidence that is "sufficient to establish by a preponderance of all the evidence the condition of the goods upon delivery." *Beta Spawn, Inc. v. FFE Transp. Servs., Inc.*, 250 F.3d 218, 225 (3d Cir. 2001) (internal citation omitted). Here, all parties agree that the rejected cheese pallets' temperature recording devices reflected temperatures above forty degrees at multiple points during transit, in violation of Trader Joe's vendor agreement with Singletons. Both Mecca and Trader

---

[2] White Arrow itself has previously conceded Mecca's standing on this claim. During proceedings in the District Court, White Arrow successfully argued that Mecca's state law claims for damages were "preempted by federal law which exclusively governs this matter involving transportation in interstate commerce." J.A. 91. It cannot now argue that the same federal law is inapplicable to Mecca's claims.

Joe's argue that these temperature readings are direct and irrefutable evidence that the cheese was already damaged at delivery, allowing Trader Joe's to reject the shipment. White Arrow disagrees, arguing that the pallet temperature readings alone do not demonstrate any damage to the cheese itself, and that Trader Joe's was "required to conduct an immediate inspection of the goods to thoroughly document the nature and extent of damage." White Arrow Br. 12. It further argues that "[n]o evidence was produced by Mecca or Trader Joe's of any contamination and that the increased temperatures in transit rendered the cheese unsafe for human consumption by the public." *Id*. at 15. However, White Arrow misses the critical point in Mecca's claim, instead relying on cases that are distinguishable from the present circumstances.

Our case law makes clear that carriers are "strictly liable for damages" under the Carmack Amendment, *Certain Underwriters at Interest at Lloyds of London v. United Parcel Serv. of Am., Inc.*, 762 F.3d 332, 335 (3d Cir. 2014), up to "the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) [certain intermediary carriers]." 49 U.S.C. § 14706(a)(1). Although carriers and shippers can agree to limit the carrier's liability in accordance with certain conditions, 49 U.S.C. § 14706(c)(1)(A), no such limitations are at issue in this case.

Here, Singletons—and, eventually, Mecca—suffered an actual loss of property when its cheese product was subject to conditions that violated the transportation requirements set out in its Master Vendor Agreement with Trader Joe's and communicated to White Arrow via email. Whether experts could reasonably disagree as to the safety of the cheese, and whether Trader Joe's could have kept the cheese under

6

observation for spoilage, is beside the point. Trader Joe's had contracted to accept the shipment only if it had been "shipped and received at 40°F or less," with the packaging clean and intact, free of dents or tears, and seals intact.[3] J.A. 384. For any party to show that the goods had been damaged before delivery, they needed only show by a preponderance of the evidence that one of Trader Joe's requirements had been violated, as a violation would render the goods unsaleable.[4] That evidence is clearly present in this case.

Mecca has also proven damages satisfactory to establish the third element of its claim. For the purpose of a Carmack Amendment claim, damages are ordinarily measured by "the difference between the market value of goods at the time of delivery, and the time when they should have been delivered." *Paper Magic*, 318 F.3d at 461 (internal citation omitted). The market value may be determined by the "invoice price," *id.* at 462, or the "contract price," *Robert Burton Assocs., Inc. v. Preston Trucking Co., Inc.*, 149 F.3d 218, 221 (3d Cir. 1998) (internal citation omitted), less any recovered value from salvage or resale, *Paper Magic*, 318 F.3d at 461. Here, the damages

---

[3] These requirements speak to "the gravity of the duty for a retailer like Trader Joe's to assure the safety of food that it sells to consumers," as the District Court aptly described. *Mecca & Sons Trucking Corp. v. White Arrow, LLC*, No. 14-7915, 2016 WL 5859018, at *4 (D.N.J. Sept. 16, 2016).

[4] White Arrow's argument that the majority of temperature readings were *near* forty degrees is unavailing. For Trader Joe's to accept the cheese shipment as undamaged, it had to "be shipped and received at 40°F or less." J.A. 384. White Arrow's second argument, that it followed its instruction to keep the shipment "chilled 40 degrees," J.A. 491, by setting the reefer to forty degrees, is also without merit. The fact remains that multiple pallets of cheese were not maintained at the required temperature.

determination for the shipment itself is simple and well supported. Mecca paid Singletons $73,581.16, the invoice price of the damaged cheese as reflected in the bills of lading. It now seeks that same amount in damages from White Arrow. Given that the cheese was destroyed, no salvage value remains, leaving $73,581.16 as the proper amount of damages for the lost shipment.

Mecca also seeks to recover the cost of transporting, storing, and destroying the rejected cheese, at a total of $7,600.00. While this claim goes beyond the market value of the shipment, "the Supreme Court has recognized that the test of market value is at best but a convenient means of getting at the loss suffered" and that "other more accurate means" may be used. *Robert Burton*, 149 F.3d at 221. Indeed, in our discussion regarding the Carmack Amendment's preemptive power, we noted that its scope is "broad enough to embrace 'all losses resulting from any failure to discharge a carrier's duty as to any part of the agreed transportation,'" *Lloyds of London*, 762 F.3d at 335 (quoting *Ga., Fla. & Ala. Ry. v. Blish Milling Co.*, 241 U.S. 190, 196 (1916)), so long as they are "foreseeable to a reasonable [person]," *Paper Magic*, 318 F.3d at 461. Further, special damages may be allowed when a plaintiff "actually notified the carrier that the goods required special handling of some kind, thereby giving the carrier notice and making the damages foreseeable." *Id.* at 462. Here, we agree with the District Court that Mecca need not pursue recovery of its additional costs under the category of special damages, as the costs associated with the handling of the rejected cheese were foreseeable by a reasonable person. As to proof, Mecca has provided adequate evidence of its costs, and White Arrow

8

has not challenged its calculations.[5] Therefore, Mecca has succeeded in establishing all three elements of its prima facie case.

Once a plaintiff is able to establish a prima facie case, "the burden shifts to the carrier to prove that it was free from negligence and that the damage was caused solely by (a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." *Beta Spawn*, 250 F.3d at 223 (internal citation omitted). White Arrow has not presented persuasive evidence in support of any of these defenses and has therefore failed to meet its burden. Thus, we can only conclude that White Arrow is liable to Mecca under the Carmack Amendment for the losses incurred by the rejected cheese.

## C. Trader Joe's Rejection of the Cheese

To the extent that we have not already addressed White Arrow's wrongful rejection claim against Trader Joe's in our discussion above, we now state plainly that this claim is without merit. Trader Joe's only obligations in relation to the cheese were determined by the Master Vendor Agreement between it and Singletons. It had no separate contractual relationship with White Arrow, and White Arrow was not a third-party beneficiary of the Master Vendor Agreement. Even assuming, *arguendo*, that one could identify a contractual obligation between the two parties, the temperature requirement remained in place at all times. Therefore, Trader Joe's was still within its

---

[5] White Arrow emphatically challenges the timeliness of Mecca's evidence submissions. However, the District Court's determination on this issue was well-reasoned and we see no grounds on which to disturb it.

rights to reject any portion of the shipment that had not been chilled at forty degrees.

Thus, we conclude that the District Court properly granted summary judgment in favor of

Trader Joe's on White Arrow's cross-claim.

**IV**

For the foregoing reasons, we will affirm the judgment of District Court.